956 So.2d 1016 (2007)
Michael Tyrone BAILEY a/k/a Micheal Tyrone Davis, Appellant
v.
STATE of Mississippi, Appellee.
No. 2004-KA-00640-COA.
Court of Appeals of Mississippi.
February 27, 2007.
*1021 Thomas M. Fortner, Jackson, Lynn Watkins, attorneys for appellant.
*1022 Office of the Attorney General by W. Glenn Watts, attorney for appellee.
EN BANC.

MODIFIED OPINION ON MOTION FOR REHEARING
GRIFFIS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. The motion for rehearing is denied, and the original opinion is withdrawn with this opinion substituted in lieu thereof. Michael Bailey was found guilty of murder. Sentenced to life imprisonment, Bailey filed unsuccessful motions for judgment notwithstanding the verdict and for a new trial. Aggrieved, Bailey appeals and raises eighteen issues. Finding no error, we affirm.

FACTS
¶ 2. Floricee Harris was brutally murdered in her home in Jackson, Mississippi, sometime between the evening of August 9 and the morning of August 10, 2000. The investigation that followed led law enforcement to two particular individuals who visited Ms. Harris the afternoon of August 9.
¶ 3. On August 9, two men illegally connected cable TV service to Ms. Harris's residence. Those two men were Michael Bailey and a man known only as "Cable Man."[1] Bailey and Cable Man did not work for free. They expected to be paid for their efforts. Apparently, Ms. Harris did not pay what Bailey and Cable Man expected.
¶ 4. Jenny Lou McGowan lived directly across the street from Ms. Harris. Ms. McGowan testified that she saw Cable Man argue with Ms. Harris around 3:00 or 4:00 p.m. on August 9. Ms. McGowan testified that they argued because Cable Man felt as though Ms. Harris owed him some money. Ms. McGowan also testified that, after they argued, Cable Man walked angrily down the street. Ms. Harris called to Cable Man and said that she would pay him if he came back that night. Ms. McGowan did not see Cable Man return that evening.
¶ 5. Ms. McGowan did not see Bailey leave with Cable Man. Ms. McGowan last saw Bailey at Ms. Harris's house around 8:00 p.m. She did not see him leave.
¶ 6. Omelin[2] Anderson lived down the street from Ms. Harris. She testified that, around 9:00 or 9:30 p.m., Bailey told her Ms. Harris owed him five dollars for his work. Ms. Anderson also testified that Bailey had a serious look on his face when he said, "[i]f that b____ don't give me my money I'm gonna kill her."
¶ 7. Ms. Sallie Oddies, a neighbor and close friend of Ms. Harris's, testified that she saw Bailey around Ms. Harris's house on August 9. Ms. Oddies also testified that at approximately 10:30 p.m., she saw a slender, light complected tall man in Ms. Harris's yard talking to her. Ms. McGowan described Cable Man as "light-skinned" and "medium height." Aside from the person who killed Ms. Harris, Ms. Oddies was the last person to see Ms. Harris alive.
*1023 ¶ 8. Shortly after midnight or in the very early morning hours of August 10, Ms. Loretta Teat, a cashier at the Shell station on Woodrow Wilson and Powell Avenue, waited on Bailey when he bought two dollars worth of gas. Ms. Teat testified that Bailey flirted with her and gave her a one dollar tip. According to Ms. Teat, Bailey drove a red or maroon van approximately the size of an SUV. Ms. Teat testified before the jury and identified Bailey by name. She said, that when she saw him purchase gas, he was greasy in that he had greasy clothes on. She called him "Grease Man." Ms. Teat also testified that her co-worker, Joseph Fitzgerald, told her that "Grease Man" was named Michael Bailey and that it was Ms. Harris's vehicle that Bailey drove at that time.
¶ 9. Vera Harris Keahey, Ms. Harris's older sister, owned and operated a child care center down the street from Ms. Harris's house. Around 10:30 a.m. the next morning, Ms. Keahey received two telephone calls regarding Ms. Harris. Ms. Anderson was with Ms. Keahey when Ms. Keahey got the first telephone call. According to Ms. Anderson, the caller told Ms. Keahey "to go up there and check on her sister."
¶ 10. Ms. Keahey testified that the caller was Bailey's niece, Regina Bailey. According to Ms. Keahey, Regina asked Ms. Keahey whether Ms. Harris had been killed. Ms. Keahey was not alarmed by Regina's first call. However, after Regina's second call, Ms. Keahey called her brother, Charles Harris, and asked him to go check on their sister. Charles complied.
¶ 11. Charles testified that Ms. Keahey called him at work and told him that someone called her and told her that Ms. Harris had been murdered. He left work immediately and went to Ms. Keahey's house. From there, he walked to Ms. Harris's house. He went to Ms. Harris's back door and found it unlocked. Charles went room to room and called his sister's name. When Charles went into Ms. Harris's bedroom, he found his sister lying dead on her bed. Charles immediately went back to Ms. Keahey's house and told her that Ms. Harris was dead and that he thought she had been raped. Charles then called 911.
¶ 12. The crime scene indicated that a brutal murder occurred. Ms. Harris's body was lying face up on her bed. Blood spatter was everywhere: on the bed, floor, walls, and ceiling of Ms. Harris's bedroom. Ms. Harris had on an unbuttoned top but her pants had been pulled down and her underwear was exposed. What appeared to be potting soil was strewn about the floor. A large flower pot had blood on it. Soil was found inside and underneath Ms. Harris's underwear. To investigators, that indicated that someone attempted to place Ms. Harris's underwear back on her after the struggle. Ms. Harris was not wearing a bra. Investigators found her bra in the living room. Ms. Harris's false teeth were found broken on the bedroom floor. According to expert testimony, Ms. Harris was beaten to death.
¶ 13. Investigators found a clean metal chisel on the kitchen counter. The bathtub located in the bathroom connected to Ms. Harris's bedroom was half full of fresh water. Other than the bed covers and sheets on a bed in another bedroom being disturbed, the remainder of Ms. Harris's house was neat, well-kept, and in order. Ms. Harris's house was unlocked and her Toyota 4Runner was parked outside with its windows down.
¶ 14. Detective Rozerrio Camel was the lead detective involved. When he arrived at the crime scene, Charles Taylor, the crime scene investigator, was already there. Detective Camel noticed Ms. Harris's red Toyota 4Runner parked in her *1024 driveway. He also noticed that the 4Runner's windows were down. He thought it was odd that Ms. Harris left her windows down in her neighborhood. From information gathered at the crime scene and interviews of neighbors and family, Bailey and Cable Man became prime suspects for location and interview. Detective Camel did not find Bailey. Officer Bobby Nichols did.
¶ 15. Sometime between midnight and 1:00 a.m., Bailey appeared at the Shell station and again walked up to Ms. Teat. Ms. Teat did not know Bailey's name. She called him "Grease Man" because Bailey appeared to be wearing the same greasy or oily clothes that she saw him in the previous night. Joseph Fitzgerald, Ms. Teat's co-worker, told Ms. Teat that the man she called Grease Man was Michael Bailey. Mr. Fitzgerald also told Ms. Teat that Bailey drove "Ms. Florene's [sic] SUV the night before."
¶ 16. The Jackson Police Department patrols the Shell station at night due to its location and out of general concern for the public. Officer Bobby Nichols, a patrolman with the Jackson Police Department, approached the Shell station and saw eight individuals hanging around the station. Officer Nichols encouraged them to leave the station.
¶ 17. Officer Nichols noticed that Bailey had a paper bag and that there appeared to be a beer bottle in that bag. As Bailey walked around the corner of Powell Avenue, Officer Nichols instructed Bailey to stop so that he could determine whether Bailey was in violation of Jackson's open container ordinance. Officer Nichols asked Bailey for his identification and told Bailey to place his hands on the hood of the patrol car. Bailey refused and instead reached into his pocket. Fearful of what Bailey might have in his pocket, Officer Nichols grabbed Bailey's arm. A fight ensued. Bailey's beer bottle broke during the struggle. Eventually, Officer Nichols subdued Bailey and placed him in handcuffs. Officer Nichols took Bailey into custody on charges of resisting arrest and simple assault on a law enforcement officer. As a consequence, Bailey was placed in detention, issued a jump suit, and his clothing was secured in a police locker.
¶ 18. Detective Camel, aware that Bailey was in custody, suspected that Bailey probably did not change his clothes between the night Ms. Harris was murdered and the night Officer Nichols arrested him. Accordingly, Detective Camel applied for and obtained a search warrant for Bailey's clothes. Pieces of apparent bloodstained cloth were removed from Bailey's shirt and pants, sent to the state crime lab, and then forwarded to Reliagene in New Orleans for DNA analysis.
¶ 19. Amirta Hall from Reliagene found that the DNA found in the blood on Bailey's clothing matched Ms. Harris's DNA. Statistically speaking, Ms. Hall testified that the odds that the DNA profile of the blood taken from Bailey's clothing matched any other human being other than Ms. Harris was 1 in 10 billion. Ms. Harris's DNA profile was extremely rare.
¶ 20. Bailey went to trial on November 3-6, 2003. The prosecution called: (a) Charles Harris; (b) Charles Taylor, the crime scene investigator; (c) Ms. Teat; (d) Jenny Lou McGowan; (e) Omelin Anderson; (f) Dr. Steven Hayne, a forensic pathologist who performed an autopsy on Ms. Harris and who testified as to the manner and cause of Ms. Harris's death; (g) Officer Bobby Nichols; (h) Detective Rozerrio Camel; (I) Cathy Brock, a forensic scientist employed by the state crime lab; (j) Marilyn Washington, a Jackson Police Officer who testified as to certain aspects of the chain of custody of evidence that stemmed from Bailey's clothing; (k) *1025 Dana Johnson, a forensic serologist employed by the Mississippi Department of Health who found blood on Bailey's clothing; (l) Amrita Lal, a forensic technician who performed the DNA analysis of the blood found on Bailey's clothing and linked it to Ms. Harris; and (m) Vera Keahey, Ms. Harris's sister.
¶ 21. Bailey did not testify. He called one witness, Ms. Sally Oddies. Ms. Oddies testified that she saw Bailey around Ms. Harris's house on August 9. Ms. Oddies also testified that at approximately 10:30 p.m., she saw a slender, light complected tall man in Ms. Harris's yard talking to her. Cable Man had previously been described similarly. At that time, Ms. Harris seemed to be happy and in good spirits. On cross-examination, the prosecutor asked Ms. Oddies how she knew Bailey. Ms. Oddies answered by describing Bailey as a "terrible cat." Ms. Oddies also testified that, prior to Ms. Harris's murder, Bailey talked to her about Ms. Harris and told her that "Floricee needed a good f___ing."
¶ 22. After the circuit court instructed the jury and counsel presented closing arguments, the jury returned a unanimous verdict and found Bailey guilty of murder. The circuit court sentenced Bailey to a life sentence in the custody of the Mississippi Department of Corrections. Bailey filed post trial motions for judgment notwithstanding the verdict and for a new trial.

ANALYSIS
I. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED HEARSAY TESTIMONY FROM LORETTA TEAT?
¶ 23. Bailey claims that the circuit court erred when it allowed the prosecution to elicit improper hearsay testimony during Loretta Teat's testimony. Bailey's assertion stems from Ms. Teat's testimony that Joseph Fitzgerald, her co-worker, told her that the man she recognized as "Grease Man" was Michael Bailey. Bailey also complains about Ms. Teat's testimony that Mr. Fitzgerald told her that the "maroon van" Ms. Teat saw Bailey in was actually Ms. Harris's vehicle. According to Bailey, Ms. Teat's testimony was inadmissible hearsay. Bailey also cites Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and submits that Ms. Teat's testimony violated his right to confront witnesses against him.

A. Hearsay
¶ 24. "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.E. 801(c). "Hearsay is not admissible except as provided by law." M.R.E. 802.
¶ 25. "The standard of review regarding the admission or exclusion of evidence is abuse of discretion." Burton v. State, 875 So.2d 1120(¶ 6) (Miss.Ct.App. 2004). "Abuse of discretion will only be found where a defendant shows clear prejudice resulting from an undue lack of constraint on the prosecution or undue constraint on the defense." Id. We will not disturb a trial court's decision unless it is clearly wrong. Id.
¶ 26. The admission of testimonial evidence is within the sound discretion of the trial court, which will be found in error only if the ruling was an abuse of discretion. Lynch v. State, 877 So.2d 1254(¶ 86) (Miss.2004). The trial court must exercise its discretion within the confines of the rules of evidence. Austin v. State, 784 So.2d 186(¶ 23) (Miss.2001). Any error in the admission or exclusion of evidence is not grounds for reversal unless the error adversely affected a substantial *1026 right of a party. Lynch, 877 So.2d at (¶ 86).
¶ 27. On direct examination, the prosecutor asked Ms. Teat whether Bailey visited her store on the evening that Ms. Harris was murdered. Ms. Teat answered, "[y]es, sir." The prosecutor then asked Ms. Teat, "What type of vehicle was [Bailey] in?" Ms. Teat responded, "[Bailey] was in a maroon van, like an Astro; like kind of big. Not like the real big one but like an SUV kind of size."
¶ 28. During cross-examination, the following exchange occurred:
Q. In fact, Ms. Teat, you didn't even know the name of the man you saw that night, did you?
A. No.
Q. You didn't know him as Michael Bailey?
A. Correct.
Q. And you didn't know him as Oil Man or Grease Man or anything like that, did you?
A. No, that's what they called him.
Q. But you didn't know him as that name?
A. Unh-uh (negative).
Q. That night when you first saw this man.
A. Correct.
Q. In fact that's what this friend Joe of yours, that's the name he gave the man. Isn't that correct?
A. Nobody didn't have to tell me. You could just see that he was greasy and you know he could be called something like that.
¶ 29. On redirect, the prosecutor asked Ms. Teat to elaborate. The prosecutor asked Ms. Teat, "And [Bailey's attorney] asked you about Joseph telling you a name. What did Joseph tell you as far as the name?" Ms. Teat answered, "He said that the guy's name was Michael Bailey and that was Miss Florene's [sic] van."
¶ 30. Ms. Teat did not offer any hearsay testimony during direct examination. Ms. Teat testified that she saw Bailey at the gas station and that Bailey drove a maroon van the size of an SUV. During cross-examination, Bailey's attorney asked Ms. Teat how she gathered more information about the man she saw that night. Bailey's attorney pointed out that Ms. Teat learned about Bailey from Joseph Fitzgerald. However, the prosecution did not object to Ms. Teat's hearsay testimony. On redirect, Ms. Teat offered further hearsay testimony, but Bailey's attorney objected. We are of the opinion that the trial judge erred when he allowed Ms. Teat's hearsay testimony. Now we turn to the issue of prejudice.
¶ 31. A trial judge has wide discretion in ruling on the admissibility of testimony offered at trial, and this Court will not reverse that decision unless prejudice amounting to reversible error resulted. Alexander v. State, 610 So.2d 320, 329 (Miss.1992). Inadmissible hearsay notwithstanding, that particular portion of Ms. Teat's testimony was not prejudicial to Bailey because Ms. Teat previously testified that she recognized Bailey as the man who appeared at the gas station on the night Ms. Harris was murdered. She also testified that Bailey drove a maroon van. She compared that van to an SUV. The prejudicial feature of Ms. Teat's testimony was that she identified Bailey, even if she did not know him by name, and she noticed the vehicle that he drove, even if she did not know it to be Ms. Harris's. There is no suggestion that Ms. Teat's eyewitness testimony was in any way inadmissible. Accordingly, even if we found that Ms. Teat unduly prejudiced Bailey through her hearsay testimony, that portion of her testimony that was not hearsay would still *1027 be admissible and equally prejudicial to Bailey's case. Thus, the trial judge erred in allowing hearsay testimony, but that error is harmless at best. Under the circumstances, we find no reversible error on the part of the trial judge.

B. Crawford

¶ 32. On November 6, 2003, the jury found Bailey guilty of murder. The United States Supreme Court handed down Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) on March 8, 2004  four months after Bailey's conviction. Thus, at the time of Bailey's conviction, Crawford had not yet been decided. Bailey filed his notice of appeal on March 24, 2004. Regardless, the United States Supreme Court has held that "a new rule for the conduct of criminal prosecutions that is grounded in the United States Constitution applies retroactively to all cases, state or federal, pending on direct review or not yet final." Powell v. Nevada, 511 U.S. 79, 84, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994) (quoting Griffith v. Kentucky, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)). As such, we apply that concept to our direct review of Bailey's appeal.
¶ 33. In Crawford, the United States Supreme Court held that "the Confrontation Clause of the Federal Constitution's Sixth Amendment bars the admissibility of out-of-court testimonial statements by an unavailable witness offered in a criminal trial to prove the truth of a matter asserted (also known as hearsay) unless the defendant has had a prior opportunity to cross-examine the witness about the statement." Frazier v. State, 907 So.2d 985(¶ 36) (Miss.Ct.App. 2005). As a result, "testimonial hearsay must be exposed to confrontation by way of cross-examination prior to reaching admissible status, while non-testimonial hearsay does not trigger the need for confrontation to be admissible." Id. at (¶ 39). "Thus, our application of Crawford to the present facts depends upon a determination of whether the evidence admitted is `testimonial.'" Id. Crawford declined to provide a firm definition of "testimonial" evidence. Crawford, 541 U.S. at 68, 124 S.Ct. 1354. Even so, Crawford did provide examples of "testimonial" evidence. Id. According to Crawford, prior testimony at a preliminary hearing, before a grand jury, or at a former trial and prior testimony during police interrogations, are all examples of "testimonial" evidence. Id.
¶ 34. We can find no indication that Joseph Fitzgerald's comments to Ms. Teat were "testimonial" within the meaning established by Crawford. Certainly none of the Supreme Court's examples of testimonial evidence apply. Mr. Fitzgerald did not make his comments during a preliminary hearing, before a grand jury, at a former trial, or during a police interrogation. Mr. Fitzgerald's comments took place between two co-workers at a time when Bailey was not a suspect to Ms. Harris's murder because, at the time of Mr. Fitzgerald's comments, no one was aware that Ms. Harris had been murdered.
II. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED DETECTIVE CAMEL TO USE TELEPHONE RECORDS DURING HIS TESTIMONY?
¶ 35. Bailey alleges that the prosecution elicited improper hearsay testimony during Detective Camel's testimony in that Detective Camel testified regarding telephone calls to which he was not a party. Bailey also submits that it was improper to allow Detective Camel's testimony regarding the subpoenaed telephone records because those records were unauthenticated.
*1028 ¶ 36. We stated the appropriate standard of review in the issue above. For brevity's sake, we will not mention it again here or in the other issues that involve admission of evidence.

A. Unauthenticated Phone Records
¶ 37. Bailey did not object to Detective Camel's use of the phone records based on the unauthenticated status of the phone records. The record shows that the prosecution submitted two sets of telephone records: one set from Peoples Funeral Home and the other from Ms. Keahey. When the prosecution submitted the records from Peoples Funeral Home, Bailey's attorney objected and said, "I guess we're going to object to relevancy, Your Honor." When the prosecution submitted the records from Ms. Keahey, Bailey's attorney objected and said, "Object to relevancy, Your Honor." The record contains no indication that Bailey's attorney objected to the records based on their unauthenticated status. Bailey first raised the issue of the unauthenticated records in his motion for a new trial. Accordingly, the issue is waived for lack of a contemporaneous objection. Slaughter v. State, 815 So.2d 1122(¶ 47) (Miss.2002).

B. Call to Peoples Funeral Home
¶ 38. Additionally, Bailey complains that Detective Camel improperly testified about a conversation he had with a coroner. During that conversation, the coroner told Detective Camel that someone called the Peoples Funeral Home about a murder that occurred on the night Ms. Harris was murdered. During cross-examination, Bailey's attorney had Detective Camel point out that the call to Peoples Funeral Home was about a woman named Mable Jefferson and was completely unrelated to Ms. Harris. On appeal, Bailey submits that Detective Camel "deliberately testified as though the call dealt with the death of Floricee Harris, when Det. Camel knew the telephone call in issue dealt with a completely unrelated matter." Further, Bailey opines that "[s]uch conduct on the part of a law enforcement officer is unconscionable and reprehensible and should not be tolerated." With due regard for Bailey's opinion, we are more concerned with whether Bailey suffered any prejudice as a result of Detective Camel's testimony. Bailey's attorney clearly established that the telephone call at issue had nothing to do with Ms. Harris or Bailey. We fail to see how Bailey suffered any prejudice from the matter at issue.

C. Calls to Vera Keahey
¶ 39. Bailey also submits that Detective Camel impermissibly testified as to telephone calls placed to Ms. Keahey. Detective Camel testified that he subpoenaed Ms. Keahey's telephone records. During his testimony, Detective Camel used Ms. Keahey's phone records and testified that, at approximately 11:18 a.m., someone at Regina Bailey's house called Ms. Keahey's house. According to Bailey, Detective Camel's testimony was inadmissible because it was hearsay and he had no firsthand knowledge of the telephone conversations.
¶ 40. Ms. Keahey also testified that Regina Bailey called her on the morning of August 10, 2000. Thus, even if we found Detective Camel's testimony inadmissible, the same evidence went before the jury through Ms. Keahey. There is no suggestion that Ms. Keahey, a direct party to the conversation, could not testify that Regina Bailey called her on the morning of August 10. If the trial judge erred in allowing the testimony at issue, that error is harmless in light of Ms. Keahey's testimony.
*1029 III. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED DETECTIVE CAMEL TO TESTIFY REGARDING THE RESULTS OF THE DNA TESTS PERFORMED ON BAILEY'S CLOTHING?
¶ 41. Detective Camel testified that, during the time Bailey was in custody, he seized Bailey's clothing and submitted Bailey's clothing to be tested for the presence of DNA. Detective Camel also testified that a DNA analysis was performed on Bailey's clothing. The prosecution asked Detective Camel whether that DNA analysis concluded that Ms. Harris's blood was on Bailey's clothing. Bailey's attorney objected and claimed that Detective Camel was not competent to testify as to the results of the DNA analysis performed on Bailey's clothing. The trial judge overruled Bailey's objection. Detective Camel then testified that the DNA analysis indicated that Ms. Harris's blood was found on Bailey's clothing.
¶ 42. On appeal, Bailey submits that Detective Camel lacked the necessary expertise to testify as to the results of the DNA analysis performed on Bailey's clothing. Bailey claims that Detective Camel's testimony amounted to improper opinion evidence and a violation of Rule 702 of the Mississippi Rules of Evidence.
¶ 43. Pursuant to M.R.E. 702:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Undoubtedly, DNA comparison testing requires specialized knowledge, skill, experience, training and education. The prosecution did not submit or qualify Detective Camel as an expert witness. Accordingly, Detective Camel should not have been permitted to testify as to the results of the DNA comparison performed on Bailey's clothing.
¶ 44. Improper opinion evidence notwithstanding, again, a trial judge has wide discretion in ruling on the admissibility of testimony offered at trial, and we may not reverse that decision unless prejudice amounting to reversible error resulted. Alexander v. State, 610 So.2d 320, 329 (Miss.1992). After Detective Camel testified, the prosecution called Amrita Lal, a forensic technician employed by Reliagene in New Orleans, Louisiana. Ms. Lal performed the DNA comparison on Bailey's clothing. The prosecution submitted Ms. Lal as an expert witness. Bailey accepted Ms. Lal as an expert witness. Ms. Lal testified, "the blood stains on [Bailey's] clothing were consistent withthe DNA profile of the clothing were [sic] consistent with the DNA profile of Floricee Harris." Based on Ms. Lal's testimony, we find that the trial judge committed harmless error when he overruled Bailey's objection to Detective Camel's testimony.
IV. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED DETECTIVE CAMEL'S TESTIMONY THAT TWO PEOPLE COULD MURDER THE SAME PERSON?
¶ 45. During direct examination, the prosecution asked Detective Camel, "isn't it true with your experience as a homicide detective that two people can murder the same person?" Bailey objected on the basis that the question was irrelevant. The trial judge overruled Bailey's objection. Bailey's attorney then *1030 added, "We object to them asking about other cases, comparing this to any other cases; it's an improper question." The trial judge overruled that objection as well.
¶ 46. On appeal, Bailey lumped this argument with the argument regarding the propriety of Detective Camel's DNA testimony above. We separate them for clarity's sake. In any event, Bailey's entire argument on this issue is that "Not only were the questions improper, it was erroneous for the trial court to overrule and permit the investigating detective to respond to [the question] because to answer, the witness was required to possess some experience or expertise beyond that of the average, randomly selected adult, thus shifting the question into one requiring that Det. Camel be qualified as an expert witness under M.R.E. 702."
¶ 47. Though the prosecution framed the question as Detective Camel's "experience as a homicide detective," the question did not require specialized knowledge or expertise to answer. It does not take an expert to conclude that it is possible for two people to kill one person. According to M.R.E. 701:
If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to the clear understanding of the testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.
We find nothing improper with Detective Camel's testimony, especially since Bailey's argument was that Cable Man was the more appropriate suspect. Considering Bailey's defense theory, Detective Camel's testimony was helpful to the determination of a fact in issue; that is, whether Cable Man and Bailey could have both been implicated in Ms. Harris's murder and whether, upon finding guilt of one or the other, it was impossible that the other could be guilty as well. We find no abuse of discretion on the part of the trial judge.
V. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED DETECTIVE CAMEL TO TESTIFY AS TO WHY HE BROUGHT BAILEY BEFORE THE GRAND JURY?
¶ 48. Bailey references a portion of Detective Camel's testimony during which the prosecution asked Detective Camel to detail why he had Bailey indicted. Notwithstanding that Detective Camel lacked the authority to indict Bailey, as that decision is within the discretion of the Hinds County District Attorney, Bailey's argument derives from the following exchange, initiated by the prosecution:
Q. Why did you have [Bailey] taken to the grand jury for the murder of Floricee Harris? What were the reasonings [sic] that you had for having this case presented to the Hinds County grand jury for the murder of Floricee Harris?
MR. FORTNER [defense attorney]:
We're going to object to that, Your Honor. That's 
MS. WOOTEN [prosecutor]: Your Honor, he is the investigating officer. He can say why he took the case to the grand jury.
THE COURT: What is your objection?
MR. FORTNER: It's an improper question and calls for conclusions based on hearsay. This invades the province of the jury.
THE COURT: Overruled. He can give his opinion.

*1031 Q. Why did you take the case to the grand jury?
A. Based on the information that I received during the investigation, a lot of the information indicated that Michael Bailey played a part or was responsible.
¶ 49. In Bailey's brief, this issue was part of one issue that raised claims against six distinctly different portions of evidence which Bailey claims were inappropriate. Bailey's entire argument on this particular testimony is the following statement: "As for [this issue], response as to why the investigating detective took the case to the Hinds County grand jury is in violation of Barlow v. State, 233 So.2d 829 (Miss.1970) and Acevedo v. State, 467 So.2d 220 (Miss. 1985), which found references to grand jury action during cross examination and discussion of grand jury action during closing the basis for reversal."
¶ 50. In Barlow, the Mississippi Supreme Court found that a prosecutor improperly cross-examined a justice of the peace when he asked him how many times a grand jury condemned him for the way he conducted his office. Barlow, 233 So.2d at 832. The supreme court went on to state, "This Court has repeatedly held that Mississippi Code 1942 Annotated section 1693 (1956) permits a cross examination of a defendant or witness as to any convictions but never as to indictments and certainly not as to censures by the grand jury." Id. The supreme court added, "Criticisms by grand juries is double hearsay, highly prejudicial, and could only have been enlisted for the purpose of degrading and prejudicing the defendant in the eyes of the jury." Id. Barlow is not on point.
¶ 51. In Acevedo, the supreme court found numerous instances of prosecutorial misconduct. Acevedo, 467 So.2d at 225-26. Among those instances, the supreme court found that error resulted based on a prosecutor's "persistent discussion in closing argument of the grand jury proceedings resulting in [the defendant's] indictment, despite objection and instruction not to do so." Id. at 226. Acevedo is not on point, either. Here, the focus of Detective Camel's testimony was not the fact that Bailey was indicted and thus, he must be guilty. In effect, the prosecutor asked Detective Camel why he felt Bailey was a likely suspect. Detective Camel responded that there were indications that Bailey was somehow connected to Ms. Harris's murder. At that point in the proceedings, evidence of Bailey's connection to Ms. Harris's murder was already before the jury.
¶ 52. There are many foreseeable circumstances in which such a line of questioning, the testimony that results, or even related testimony could be impermissible. However, the testimony at issue did not violate the precedent set forth in Barlow or Acevedo. We find no reversible error based on the line of questioning at issue and Bailey's argument on that line of questioning.
VI. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED DETECTIVE CAMEL TO TESTIFY AS TO OTHER INSTANCES OF HEARSAY?
¶ 53. In this issue, Bailey groups three particular portions of Detective Camel's testimony and claims that they were impermissible hearsay. Bailey's entire argument on the three following portions of Detective Camel's testimony is as follows: "As for questions 3 through 5 the prosecution clearly sought to elicit inadmissible hearsay, or an out-of-court statement offered for the truth of the matter asserted, in violation of M.R.E. 802." Applying leniency to our standards regarding briefing *1032 of issues, we address Bailey's complaints in turn.

A. Two People in Ms. Harris's Home
¶ 54. In his brief, Bailey submits that it was improper for Detective Camel to testify in response to particular questions asked by the prosecution. Bailey lists those questions as "Did you learn two people were inside the victim's home? Who were they?" As best we can tell, Bailey references a portion of Detective Camel's testimony on direct examination during which the prosecution asked Detective Camel, "Did you learn if two individuals had been in the home of Floricee Harris?" Detective Camel answered, "Yes." That is clearly not a hearsay statement. Detective Camel did not offer someone else's statement when he simply said "yes."
¶ 55. Second, Bailey references the prosecution's follow-up questions. The prosecution asked Detective Camel, "What were their names?" Detective Camel responded, "Michael Bailey and Cable Man." Likewise, that is not a hearsay statement. Detective Camel did not offer anyone else's statement when he testified as to the results of his investigation. We find no merit to this assertion.

B. Investigation of Regina Bailey
¶ 56. Here, Bailey includes portions of Detective Camel's redirect testimony during which he discussed his actions after he took a statement from Regina Bailey. Bailey's argument falls within his blanket assertion of instances of impermissible hearsay. Bailey's brief states, "It was error for the trial court to permit, over the objections of Mr. Bailey, the following. . . . If Regina Bailey, a niece to Mr. Bailey, told the investigating detective that Mr. Bailey shed bloody clothing he was wearing."
¶ 57. True enough, on redirect, the prosecution asked Detective Camel whether he found articles of clothing based on a statement he took from Regina Bailey. However, none of that clothing was connected to Bailey. There was no proof that Bailey ever wore the clothing or that the clothing somehow implicated Bailey in Ms. Harris's murder. The only clothing that connected Bailey to Ms. Harris's murder was that clothing seized while Bailey was in custody. We can find no reversible error based on clothing.

C. Whether Detective Camel Framed Bailey.
¶ 58. The final allegation under this blanket argument is that the prosecution "clearly sought to elicit inadmissible hearsay" when the prosecution asked Detective Camel, "Did you open up that blood stain card and say I think I'll rub it on the clothes of Michael Bailey so I can frame him for this murder?" Bailey's attorney stated, "Objection, Your Honor." The trial judge overruled Bailey's objection. Detective Camel then answered, "No."
¶ 59. First and foremost, Bailey did not object on the basis of hearsay. As such, he is procedurally barred from asserting an issue that he did not raise before the trial court. Procedural bar notwithstanding, Detective Camel's testimony was not hearsay and did not even call for hearsay. The question did not ask for some other person's statement and the response did not rely on another's statement. This assignment of error is completely and entirely without merit.
VII. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED THE PROSECUTION TO MAKE IMPROPER COMMENTS DURING CLOSING ARGUMENTS?
¶ 60. Bailey submits that the prosecution committed reversible misconduct during *1033 closing arguments. According to Bailey, the prosecution referred to hearsay testimony that was not in evidence, engaged in personal attacks against defense counsel, disparaged defense counsel, disparaged defense counsel's closing remarks, and suggested that defense counsel was not truthful. In this issue, Bailey also suggests that the cumulative effect of prosecutorial misconduct in this issue and several others mandates reversal. We will not analyze the cumulative effect of errors in this issue, as we must first discuss Bailey's other numerous allegations of prosecutorial misconduct before we can determine a cumulative effect. However, we will consider that allegation below.
¶ 61. "The standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." Slaughter v. State, 815 So.2d 1122(¶ 45) (Miss.2002).

A. Comments About Regina Bailey
¶ 62. Bailey's first allegation of prosecutorial misconduct stems from the prosecution's comment during closing arguments, "How did the blood on Michael Bailey's clothes get there? That's what you have to come up with. How did it get there. And the only thing that came out about someone soaked in blood was this man's niece told that detective." At that point, Bailey's attorney objected and said, "This man's niece did not testify in this case." The record indicates that an off-the-record bench conference occurred, but the exact resolution of Bailey's objection is unclear. As best we can tell, the trial judge overruled Bailey's objection because the prosecution resumed their closing argument and said, "When Detective Camel was testifying, he testified that Michael Bailey's niece is the one that saw Michael Bailey soaked in blood the day after this murder."
¶ 63. On appeal, Bailey's entire argument regarding the prosecution's comment about Regina Bailey is as follows: "The prosecutor here referred to hearsay testimony not even in evidence from a witness who never even testified, his [sic] niece, Regina Bailey." Bailey then references Flowers v. State, 773 So.2d 309 (Miss.2000) and Flowers v. State, 842 So.2d 531 (Miss. 2003).
¶ 64. In Flowers I, the Mississippi Supreme Court found portions of a prosecutor's closing argument to be improper where the prosecutor based his argument on inconsistent statements recorded on a tape that was not admitted into evidence. Flowers, 773 So.2d at (¶ 66). In Flowers II, the Supreme Court found several instances in which a prosecutor misstated testimony of witnesses and repeatedly argued facts not in evidence. Flowers, 842 So.2d at (¶ 74).
¶ 65. Here, the record indicates two equally competent reasons why the prosecution's comments were not improper and do not result in reversible error. First, the record is insufficient to determine the outcome of Bailey's objection. Second, the record reveals that the prosecution's argument was in response to a significant portion of Bailey's closing argument.
¶ 66. During his closing argument, Bailey's attorney pointed out that Ms. Harris was brutally murdered and that blood spatters covered a large area of Ms. Harris's bedroom. Bailey's attorney also suggested that Bailey would have been covered in blood, had he murdered Ms. Harris. It is clear that Bailey's attorney was attempting to minimize Bailey's culpability *1034 based on the small volume of Ms. Harris's blood on Bailey's clothing. This is evident from the following:
[Bailey's] shirt, according to Detective Camel, he was seen with a shirt covered in blood. Now, that's called having your cake. Eating it, too, is them coming in here and saying this shirt with three spots of human blood is the shirt that was being worn by Michael Bailey when he stood in that room beat Ms. Harris to death and blood spattered all over, covered it in blood. And they have presented to you a shirt that they are saying because of it you must find him guilty of murder. You have to be convinced beyond a reasonable doubt to follow their line of reasoning that that shirt is the shirt that was worn by Michael Bailey when he beat Ms. Harris to death and it was covered in blood. And that is the shirt that their forensic scientist, Dana Johnson, said I found three spots, three spots. And they sent one of them to the Reliagene Lab. Not ten spots, not sheets of blood, not strips of blood, not a lot of blood. Three spots of blood. That's it.
And even Officer Nichols who arrested Michael Bailey within 24 hours did not see any blood on his shirt, the shirt that is supposed to be covered in blood. The shirt that was worn while this woman was bludgeoned is not covered in blood. It has three spots at the most of human blood.
. . . .
Maybe now there are two people involved in this and it's Cable Man and Michael Bailey and maybe the only reason his shirt is not covered in blood now is because he was just kind of part of this. Maybe.
I don't know what they're saying here to explain this shirt problem that they've got but they'll have to say something.
. . . .
My client was arrested on August 9th. He was the easiest person to arrest in this case. They don't have any evidence but he was the easiest person to arrest in this case. And when he was arrested he wasn't wearing a blood-soaked shirt. He wasn't covered in blood. And if he had done this crime in that shirt that's what he would be wearing.
¶ 67. The prosecution responded to Bailey's closing argument when it said, "the only thing that came out about someone soaked in blood was this man's niece told that detective ." No reversible error results where a prosecutor's remarks are in response to defense counsel's previous argument. See Brewer v. State, 725 So.2d 106 (¶ 139) (Miss.1998). Because the prosecution's comment was in response to defense counsel's closing argument, we find no reversible error based on this particular comment.

B. Attacks on Defense Counsel
¶ 68. Bailey submits that, during closing arguments, the prosecution personally verbally attacked his defense counsel and improperly suggested that his counsel was untruthful. Bailey does not point to any particular statement that serves as the basis of his allegations. However, he does cite to two pages in the record and three pages in the record excerpts included with his brief. Among those references, we can find no comment that could be taken as a personal attack on defense counsel or an allegation that defense counsel was untruthful.
¶ 69. Bailey cites Edwards v. State, 737 So.2d 275 (Miss.1999) for the proposition that it is inappropriate for a prosecutor to disparage defense counsel. In Edwards, the prosecutor stated:

*1035 But, instead, ladies and gentlemen, he made an argument that, quite honestly, I don't have sympathy as I thought I would for him, because I can't believe that anybody could get up here with a straight face and argue to you the things that he has just argued. . . .
Quite honestly, ladies and gentlemen, it boggles my mind as to how anybody could argue such a ridiculous proposition, other than the fact I realize they have a job to do and they have to come up with something. But it is still mind boggling how anybody can stand here with a straight face in front of you and say we haven't proven that. . . .
Now, that does tee me off, ladies and gentlemen, for the defense lawyer, the man who is representing the man who made those maggots infest that man's head, that man over there is defending the dignity of Tony Roberts by telling you that the photographs that show the bullet holes in his head don't show something important in this case?
Id. at (¶ 54).
¶ 70. Upon examination of the prosecution's entire closing argument, and not just those pages to which Bailey refers, we can find no comment to which Bailey objected that even remotely resembles the comments at issue in Edwards. The only mention of defense counsel was after the prosecution began closing arguments with the statement, "You know, every time I listen to closing arguments and then I get to do the rebuttal where I came up and be the last person you hear, I always try to listen to what the defense attorneys say. Because it's interesting what they do say and what they don't say." The trial judge sustained Bailey's objection on the basis that it was improper to comment about other defense attorneys. That is certainly not equivalent to the comments in Edwards. We find no merit to this allegation.

C. Hanging the Jury
¶ 71. On appeal, Bailey devotes one sentence to the prosecutor's comment in closing argument in which "she castigated jurors in case they wanted to `hang it up.'" What the prosecutor said was, "You [the jurors] have a decision to make today. You can find him guilty and all twelve of you have to find him guilty. Or you can find him not guilty and all twelve of you have to resolve that blood [the blood on Bailey's shirt that was shown by DNA testing to have been the victim's]. And if you can resolve it that he just happened to get it on him somehow, then you can find him not guilty or you can hang this thing up and we will come back. . . ." The prosecutor's argument was cut off by Bailey's objection, which was denied.
¶ 72. The record shows that the argument was made in rebuttal to Bailey's theory of the case that there had been a second man in the victim's house, who was not found, and that man, rather than Bailey, should have been the primary focus of the police investigation. It is well settled that parties have latitude to argue in rebuttal to arguments raised by other parties. See, e.g., Morgan v. State, 818 So.2d 1163(¶ 31) (Miss.2002). Moreover, the trial judge is in the best position to determine if an alleged objectionable remark has a prejudicial effect. Steen v. State, 873 So.2d 155(¶ 27) (Miss.Ct.App.2004). This issue is without merit.

D. Cumulative Effect
¶ 73. Bailey suggests that the cumulative effect of the multiple instances of prosecutorial misconduct mandates that we reverse. As we can find no prosecutorial misconduct, there can be no cumulative effect at this point in our analysis. Bailey submits, "Coupled with the errors assigned *1036 in [other issues], prosecutorial misconduct alone warrants reversal as the errors in this record demonstrate the denial of Mr. Bailey's fundamental rights to a fair and impartial trial." We find no error as a result of this cluster of allegations. We will examine those errors assigned in Bailey's other issues and determine whether reversible error is appropriate there, but we find none here.
VIII. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED PROSECUTORIAL MISCONDUCT DURING CHARLES TAYLOR'S TESTIMONY?
¶ 74. In Bailey's next clustered allegations of errors, he references four questions mentioned during Charles Taylor's testimony. Here, Bailey claims the circuit court failed to recognize the reversible effect of cumulative errors that resulted because the prosecution improperly questioned Taylor.

A. Have you ever tampered with evidence?
¶ 75. The prosecution asked Taylor whether he ever tampered with evidence that he seized. Bailey objected and claimed that the question was "improper direct examination." The trial judge overruled Bailey's objection. The prosecution again asked Taylor whether he had ever tampered with any evidence he seized. Bailey objected again, this time on the basis that the prosecutor asked a leading question. The trial judge sustained Bailey's objection. The prosecutor did not ask the same question again. Instead, the prosecutor asked Taylor to explain what a crime scene investigator does and how a crime scene investigator is trained.
¶ 76. We can find no error based on this exchange. The trial judge sustained Bailey's objection, the prosecution did not repeat the question, though it was never found to be improper other than that it was a leading question. Finally, during Bailey's opening statement, Bailey's attorney stated:
You're going to see that the evidence is going to show you that for several months nothing happened. They couldn't prove anything against Michael Bailey but he was locked up and held in jail. They got his clothes and they took blood from him, they took hair from him; they took everything they could take from a person while he was sitting in jail and nothing matched with Michael Bailey.
Then six months later in March of 2001, six months later, the testimony is going to show you that finally the Jackson Police Department, who had custody of all the evidence  they had Floricee Harris' blood, they had her clothing, they had pieces of carpet from her house. They had dirt, they had a chisel. They had custody of all of this evidence and finally six months later they send a couple of cuts of a shirt and pants. They don't send the whole shirt or the whole pair of shoes. They send little cuts of material six months later to a lab in New Orleans, Louisiana and that lab says that the DNA on that material matches Floricee Harris'.
Now, we believe that the evidence is going to show you that one of two things happened here. Either that was intentionally fabricated against Michael Bailey or it was unintentionally fabricated but either way her blood was not on his clothes when he was arrested.
¶ 77. Based on Bailey's opening statement, the prosecution responded to Bailey's allegations of evidence tampering. We can find nothing improper about the question at issue.

*1037 B. Do people ever wash murder weapons?
¶ 78. On direct examination, the prosecution asked Taylor whether "people ever wash off murder weapons[.]" Bailey's attorney objected and claimed the question was irrelevant. The prosecutor responded that she could "tie it up." The trial judge overruled Bailey's objection. Taylor indicated that, occasionally, people do wash murder weapons. Taylor then testified that he found "suspected stains" inside Ms. Harris's bathroom sink.
¶ 79. Bailey's brief does not address this specific line of questioning. In any event, there is no indication that Bailey suffered any prejudice as a result of the question he mentions. We find no prosecutorial misconduct based on this allegation.

C. Are rape victims ever forced to bathe?

D. Does a tub of water indicate the [rape] victim was forced to bathe?
¶ 80. Bailey claims that the circuit court erred when it allowed the prosecution to ask Taylor questions that "were deliberately couched so to lead jurors to believe that Michael Bailey raped Floricee Harris while killing her." Bailey submits that the prosecution "used [the questions] to inflame the jury."
¶ 81. The record shows the prosecution asked the questions at issue during redirect examination. The record also shows that, during cross-examination, the following exchange occurred:
Q. Also in the bathroom attached to Ms. Harris' bedroom where her body was found, what was the condition of bathtub? [sic]
A. The bathtub was approximately half filled up with water.
Q. Filled up with water like you would fill up a bathtub to take a bath. Is that right?
A. Yes.
. . . .
Q. As far as Ms. Harris [sic] condition when you found her, I believe there has been testimony or photographs showing the clothing that she had on. Is that correct?
A. Yes.
Q. There was a shirt that was unbuttoned?
A. Shirt unbuttoned.
Q. And she did not have a bra on.
A. And no bra on.
Q. And I think that you have seen some photographs and they've been introduced of her pants and underwear on her body. Is that right?
A. Correct.
Q. What was the conclusion that you reached as a crime scene investigator concerning the condition of her pants and underwear?
A. It appeared that the pants and underwear had been pulled down and then replaced back on the body.
Q. Why did you conclude they had been put back on the body?
A. There was potting soil inside the underwear and in the genital area.
Q. When you examined her to the extent that you examined her, her underwear was actually covering up her genital area. Is that correct?
A. Correct.
Q. And underneath that underwear there was potting soil?
A. Yes.
Q. And is that what made you conclude that the pants and the underwear had been replaced on her?
A. Yes, and the condition of the pants themselves being unbuckled and *1038 looked to be kind of pulled down on her.
Q. Was there a rape kit taken on this victim or do you know?
A. If it was it would have been done at the autopsy, sir.
¶ 82. On direct examination, the prosecution did not elicit questions regarding rape or the fact that Ms. Harris may have been forced to bathe. Those questions came out during redirect. They were in direct response to Bailey's attorney's cross-examination. The questions were relevant because the jury could conclude that, based on the pictures of the crime scene, Ms. Harris could have been the victim of sexual assault. In any event, based on the sequence of the questions in relation to cross-examination, we can find no prosecutorial misconduct of reversible proportions.
IX. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED PROSECUTORIAL MISCONDUCT DURING DR. HAYNE'S TESTIMONY?
¶ 83. Bailey claims the circuit court erred when it allowed the prosecution to ask Dr. Hayne and Dana Johnson questions regarding whether Ms. Harris was the victim of a sexual assault. According to Bailey, those questions had no basis in evidence and were irrelevant, prejudicial, and inflammatory.

1. Questions Regarding Sexual Assault.
¶ 84. During direct examination, the prosecution asked Dr. Hayne whether he performed tests to conclude or exclude the possibility that Ms. Harris was raped. Dr. Hayne answered that he employed a sexual assault kit to attempt to collect evidence. He did so because Ms. Harris's clothing was disheveled and because the coroner requested such. Dr. Hayne found no abrasions or tears indicative of sexual assault. On cross-examination, Dr. Hayne testified that, in the course of his examination, he saw no physical evidence that indicated sexual assault. As mentioned, the issue of sexual assault arose after pictures of the crime scene went into evidence. Without any further explanation, the jury could have concluded that Ms. Harris was the victim of sexual assault. Bailey suffered no prejudice because Dr. Hayne testified that he saw no indication of sexual assault.

2. Use two weapons to kill someone?
¶ 85. Bailey claims the prosecution improperly questioned Dr. Hayne regarding whether two weapons could be used to kill someone. Bailey claims the questions were irrelevant and lacked any basis in evidence. On the contrary, the prosecution submitted a bloody flower pot and a metal chisel as potential murder weapons. Dr. Hayne's testimony was relevant because he testified that he found injuries that indicated two weapons were used; one to bludgeon Ms. Harris and another that produced triangular wounds.
X. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED PROSECUTORIAL MISCONDUCT DURING DANA JOHNSON'S TESTIMONY?
¶ 86. Similar to the issue above, Bailey claims that the prosecution improperly questioned Dana Johnson about the presence of sexual assault. On cross-examination, Johnson testified that she performed a sexual assault kit on Ms. Harris. She also testified that she performed an acid phosphatase test to determine the presence of semen. According to Johnson, the acid phosphatase test produced a slight reaction but the reaction was so slight that policy dictated further testing for sexual assault was unnecessary. Bailey was not prejudiced because Bailey's attorney questioned Johnson about sexual assault and Johnson's testimony indicated that she found no evidence of rape.
*1039 XI. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED PROSECUTORIAL MISCONDUCT DURING THE TESTIMONY OF OFFICER NICHOLS, DR. HAYNE, AND DETECTIVE CAMEL THAT CAUSED DEFENSE COUNSEL'S REPEATED OBJECTIONS WHICH CUMULATIVELY PREJUDICED BAILEY BEFORE THE JURY?
¶ 87. Bailey claims that the circuit court erred when it allowed the prosecution to ask three witnesses: Officer Bobby Nichols, Dr. Hayne, and Detective Camel, questions that were improper, prejudicial, and inflammatory. Bailey submits that, because his counsel was forced to object to questions that were designed to provoke such a response, the prosecution tactically caused the jury to become unsympathetic to Bailey and were therefore less likely to find for Bailey. According to Bailey's brief, "Such choices present a Damoclean choice for counsel, who must balance antagonizing the jury of laymen unfamiliar with the necessity for such objections with zealous protection of his or her client." Bailey claims that the cumulative effect of those forced objections resulted in a violation of his constitutional rights. However, there is no evidence that the jury was unsympathetic to Bailey based on the frequency of his attorney's objections.
XII. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED THE PROSECUTION TO CALL WITNESSES WHO WERE NOT TIMELY DISCLOSED DURING DISCOVERY?
¶ 88. Here, Bailey claims that the circuit court erred when it allowed the prosecution to call Loretta Teat and Jenny Lou McGowan as witnesses because the prosecution did not disclose the fact that they would be called as witnesses until the day of trial.
¶ 89. The prosecution is obligated to disclose to a defendant's attorney, names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, together with a copy of the contents of any statement, written, recorded or otherwise preserved of each such witness and the substance of any oral statement made by any such witness. URCCC 9.04(A)(1). If at any time prior to trial it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, or enter such other order as it deems just under the circumstances. URCCC 9.04(I). The decision to grant or deny a motion for a continuance is within the sound discretion of the trial court and will not be grounds for reversal unless shown to have resulted in a manifest injustice. Evans v. State, 844 So.2d 470(¶ 14) (Miss.Ct.App. 2002). We may only reverse the trial court's decision regarding the presence of a discovery violation if we find an abuse of discretion. Id. at (¶ 11).

1. Loretta Teat
¶ 90. Ms. Teat testified on November 4, 2003, the second day of Bailey's trial. When the prosecution called Ms. Teat, Bailey's attorney objected and claimed that he did not receive any statements from her. The circuit court took a five minute recess and gave Bailey's attorney an opportunity to speak with Ms. Teat before she testified. After that recess, the circuit court asked Bailey's attorney whether he had an opportunity to speak with Ms. Teat. Bailey's attorney answered that he did. However, he reiterated his objection for the record. He said:

*1040 I have not received any discovery of any statements or proposed testimony of this witness prior to her being called as a witness. I still maintain that I did not receive any discovery in this matter on this particular witness. However, I've now received a two-page statement that was taken in June of 2002 by, I think, an investigator with the District Attorney's office. I've talked with the witness and I'm ready to proceed with the witness at this time.
On appeal, Bailey submits that the prosecution failed to comply with URCCC 9.04 and that he suffered prejudice in that he was unable to contact Ms. Teat to verify or discuss her statement. Bailey also claims that he was surprised when Ms. Teat testified that Joseph Fitzgerald told her that the man she saw was Michael Bailey and that Bailey drove Ms. Harris's vehicle that night.
¶ 91. On November 3, 2003, the first day of trial, Bailey filed an unsuccessful pretrial motion in limine and claimed that he did not receive proper discovery incident to Vera Keahey. Bailey did not mention Ms. Teat. During discussions regarding whether the prosecution properly disclosed Ms. Keahey, the prosecution stated, "this morning Loretta Teat, one of our witnesses, showed up with a card left at her door from [Bailey's attorney's] investigator, Patrick Kelly." As mentioned, Ms. Teat testified on November 4, 2003. While there is no discovery document in the record that identified Ms. Teat as a potential witness, the certified copy of the docket entries shows that the prosecution subpoenaed Ms. Teat on August 28, 2003, September 2, 2003, and October 7, 2003. Combined with Bailey's failure to complain about Ms. Teat in his pretrial motion in limine, the fact that Bailey was obviously aware of Ms. Teat's potential testimony in that his investigator attempted to contact her at least one day before she testified, and the repeated subpoenas to Ms. Teat, it is clear that Bailey could not have been surprised when the prosecution called Ms. Teat as a witness. What is more, the trial judge gave Bailey's attorney an opportunity to interview Ms. Teat before she testified. Considering the circumstances, we cannot find that the trial judge abused his discretion.

2. Jenny McGowan
¶ 92. Bailey's attorney objected and submitted that he never received discovery pertaining to Ms. McGowan. The trial judge reviewed the court file and noted that, on February 18, 2003, the prosecution served a response to discovery and identified Jenny McGowan as a potential witness. The trial judge also noted that "[t]he document in the court file also shows that a copy of the statement was given to [Bailey]." The trial judge stated, "after reviewing the file the Court notes that the subpoena shows Jenny McGowan's name and the first objection to this witness is made by [Bailey] after the witness had been called to testify by the State." The trial judge decided he would not strike Ms. McGowan's testimony. He ordered the State to give Bailey's attorney a copy of Ms. McGowan's statement. Because Bailey was aware that the prosecution intended to call Ms. McGowan as a witness at least eight months prior to trial, we can find no abuse of discretion on the part of the trial judge.
XIII. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED THE PROSECUTION TO PRESENT DOCUMENTARY EVIDENCE THAT WAS NOT TIMELY DISCLOSED DURING DISCOVERY?
¶ 93. Between Detective Camel and Cathy Brock's testimony, Bailey stated, "Judge, . . . I have just been handed a set of documents from the State that has *1041 to do with chain of custody of the evidence in this case concerning the DNA testing. Most of these I have never seen before. If they're going to get into this, I'll have to ask the Court to give me just a few minutes to look through these real quick." The trial judge gave Bailey's attorney an opportunity to review three documents the prosecution intended to submit and otherwise overruled Bailey's objections.
¶ 94. Bailey claims that he did not receive chain of custody documents regarding the samples used in DNA testing. Bailey claims he suffered prejudice in that he was not able to review those documents for possible inconsistencies.
¶ 95. However, the record shows that Bailey had "some" of those chain of custody documents, though not necessarily which documents. Regardless, the trial judge, in his discretion, allowed Bailey the time to review the documents. We can find no abuse of discretion here.
XIV. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED IMPROPER OPINION EVIDENCE FROM OMELIN ANDERSON REGARDING THE NATURE OF BAILEY'S THREAT AGAINST MS. HARRIS?
¶ 96. In this issue, Bailey claims that Omelin Anderson gave improper opinion evidence when she testified regarding the nature of threats that Bailey made against Ms. Harris. Ms. Anderson testified that Bailey referred to Ms. Harris when he said, "If that b____ don't give me my money, I'm gonna kill her." The prosecutor then asked Ms. Anderson whether Bailey was "smiling and laughing when he said he was going to kill" Ms. Harris. Ms. Anderson testified that he was not. At that point, Bailey's attorney objected and argued, "That's a misstatement of the evidence." The trial judge overruled Bailey's objection.
¶ 97. Bailey did not object to Ms. Anderson's testimony on the basis that it was improper opinion evidence. Failure to object at trial operates as a procedural bar to our considering it an error on appeal.
XV. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED SALLY ODDIES TO TESTIFY THAT BAILEY WAS A "TERRIBLE CAT" AND THAT BAILEY SAID MS. HARRIS NEEDED "A GOOD F____ING"?

A. "Terrible Cat"
¶ 98. Ms. Oddies was Bailey's witness. On cross-examination, the prosecution asked Ms. Oddies, "How did you know Michael Bailey?" Ms. Oddies responded, "Well, he was a terrible cat." Bailey's attorney objected and said, "That's improper." The trial judge asked Bailey's attorney, "What are you objecting to? The question or her answer?" Bailey's attorney clarified, "I'm objecting to her answer. It's non-responsive. . . ." The trial judge overruled Bailey's objection.
¶ 99. True enough, Ms. Oddies's testimony that Bailey was a "terrible cat" was unresponsive to the prosecution's question. However, the prosecution merely asked Ms. Oddies how she knew Bailey. There was nothing improper about the prosecution's question, and Ms. Oddies's answer was unsolicited. The prosecution then asked Ms. Oddies how she knew Bailey, but prefaced that question with instructions not to give her opinion of Bailey. We can find no abuse of discretion on the part of the trial judge.

B. "A good f____ing"
¶ 100. Ms. Oddies also testified that Bailey told her Ms. Harris needed "a good f____ing." Bailey complains on appeal, but he did not object at trial. Bailey's complaint on appeal is barred due to lack of a contemporaneous objection. Frazier, 907 So.2d at (¶ 28).
*1042 XVI. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED OFFICER NICHOLS TO TESTIFY THAT HE ARRESTED BAILEY BECAUSE BAILEY VIOLATED JACKSON'S OPEN CONTAINER ORDINANCE?
¶ 101. According to Bailey, Officer Nichols should have been prohibited from testifying that he arrested Bailey because he suspected Bailey violated Jackson's open container ordinance and that, during his attempt to arrest Bailey, Bailey resisted arrest. Bailey suggests that Officer Nichols's testimony was irrelevant and should have been excluded under M.R.E 404(b).
¶ 102. "Evidence of other crimes or bad acts is also admissible in order to tell the complete story so as not to confuse the jury." Ballenger v. State, 667 So.2d 1242, 1257 (Miss.1995). "Where substantially necessary to present to the jury `the complete story of the crime' evidence or testimony may be given even though it may reveal or suggest other crimes." Id. Here, Officer Nichols's testimony was necessary to present a complete story of how (1) Bailey reappeared at Ms. Teat's gas station on consecutive nights, and (2) how Bailey ended up in custody where Detective Camel seized his clothing for DNA testing. We find no reversible error resulting from Officer Nichols's testimony.
XVII. DID THE CIRCUIT COURT ERR WHEN IT ALLOWED AMRITA LAL TO TESTIFY THAT "NO ONE ELSE ON EARTH" BUT MS. HARRIS COULD HAVE BEEN THE SOURCE OF THE BLOOD FOUND ON BAILEY'S CLOTHING?
¶ 103. In this issue, Bailey complains about Amrita Lal's testimony that "no one else on earth" but Ms. Harris could have supplied the blood that she found on Bailey's shirt. Bailey submits that Lal's testimony violated M.R.E 702 and invaded the province of the jury.
¶ 104. Ms. Lal testified that she examined thirteen different areas on the DNA taken from the blood found on Bailey's shirt and compared that to Ms. Harris's known DNA sample. Ms. Lal testified that they matched and that, "[t]he frequency of occurrence of that profile on the shirt and on the jeans would occur in approximately one in greater than ten billion person of either African-American race, Caucasian race, or the Hispanic race." Ms. Lal went on to testify that, "It's a very rare profile that was found on the jeans and on the shirt. So the statistics show that you would need greater than ten billion persons of either one of those races to see that profile again. And since the world's population right now doesn't have greater than ten billion persons of any race, that would be very, very unlikely."
¶ 105. Ms. Lal testified as an expert witness. The results of her DNA tests showed that the likelihood that Ms. Harris's DNA would match someone else's would be one in ten billion. Her opinion is not prohibited by M.R.E. 702 as long as "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." There is no indication that Ms. Lal's testimony violated M.R.E. 702. We cannot find that the trial judge abused his discretion.
*1043 XVIII. DID THE CIRCUIT COURT ERR WHEN IT OVERRULED BAILEY'S MOTION TO SUPPRESS THE EVIDENCE SEIZED AS A RESULT OF HIS ARREST?
¶ 106. On October 30, 2003, the circuit court conducted a hearing on Bailey's motion to suppress the evidence seized as a result of his arrest. The circuit court overruled Bailey's motion. Bailey claims that the circuit court should have sustained his motion to suppress all evidence that derived from his arrest on August 10, 2000. According to Bailey, that arrest was improper because Officer Nichols did not have a warrant to arrest him and there was no probable cause to arrest him. Alternatively, Bailey claims that even if the arrest was valid, Detective Camel obtained the DNA evidence as a result of Bailey being subjected to unlawful detention.
¶ 107. The standard of review regarding a trial judge's ruling at a suppression hearing is whether substantial credible evidence was present to support the trial judge's finding when evaluating the totality of the circumstances. Price v. State, 752 So.2d 1070(¶ 9) (Miss.Ct.App. 1999). Otherwise, our familiar standard of review regarding admission of evidence applies.
¶ 108. There is no doubt that Officer Nichols had probable cause to detain and arrest Bailey. Officer Nichols saw Bailey with a brown bag with what appeared to be a bottle inside. Officer Nichols suspected that Bailey was violating Jackson's open container ordinance. When Officer Nichols attempted to determine whether that was the case, Bailey refused to place his hands on the hood of Officer Nichols patrol car. Bailey then placed his hand in his pocket. Officer Nichols feared that Bailey had a weapon. When Officer Nichols grabbed Bailey's hand to prevent Bailey from producing a weapon, Bailey fought with him. During that fight, Bailey's beer bottle broke and a crack pipe fell out of Bailey's mouth. Officer Nichols certainly had probable cause to arrest Bailey for resisting arrest, assault of a police officer, and possession of paraphernalia.
¶ 109. Alternatively, Bailey claims he was illegally detained. On August 11, 2000, Officer Nichols filed affidavits against Bailey for simple assault, resisting arrest, and possession of paraphernalia. Also, Bailey's record excerpts indicate that, on August 11th, Detective Camel made Bailey aware of his Miranda rights incident to Ms. Harris's murder. Bailey remained in custody. However, on August 18, 2000, an order from the Jackson Municipal Court instructed the Jackson Police Department to lift the "murder hold" against Bailey. Bailey submits that he remained in custody in violation of the municipal court order and, as such, the trial judge should have sustained Bailey's motion to suppress because Detective Camel acquired evidence from Bailey's clothing while he remained in illegal custody.
¶ 110. Bailey is technically correct about that particular consideration, but there is more to consider. Independent from the murder hold against Bailey were three misdemeanor charges. After he was convicted of the three misdemeanor charges on September 11, 2000, Bailey received a $1,731 fine. Bailey was unable to pay his fine. Bailey was detained in lieu of payment. Pursuant to Section 99-19-20 of the Mississippi Code:
(1) When any court sentences a defendant to pay a fine, the court may order (a) that the fine be paid immediately, or (b) that the fine be paid in installments to the clerk of said court or *1044 to the judge, if there be no clerk, or (c) that payment of the fine be a condition of probation, or (d) that the defendant be required to work on public property for public benefit under the direction of the sheriff for a specific number of hours, or (e) and combination of the above.
(2) The defendant may be imprisoned until the fine is paid if the defendant is financially able to pay a fine and the court so finds, subject to the limitations hereinafter set out. The defendant shall not be imprisoned if the defendant is financially unable to pay a fine and so states to the court in writing, under oath, after sentence is pronounced, and the court so finds, except if the defendant is financially unable to pay a fine and such defendant failed or refused to comply with a prior sentence as specified in subsection (1) of this section, the defendant may be imprisoned.
Miss.Code Ann. § 99-19-20 (Rev.2000).
¶ 111. The record is insufficient as to exactly how the municipal court handled Bailey's fine. Bailey's record excerpts contain a copy of a mittimus, dated September 11, 2000, by which the municipal court judge commanded the Hinds County Sheriff to keep Bailey in custody as a result of Bailey's convictions for resisting arrest, simple assault on a law enforcement officer, and two counts of possession of paraphernalia. That mittimus also directed the sheriff to keep Bailey in custody until Bailey's fine was satisfied. The record contains no statement by Bailey in which he, under oath, stated that he was financially unable to pay his fine. In light of the insufficient record, Bailey's failure to cite authority, and the discretion allowed to the trial judge, we find that substantial evidence supported the trial judge's decision and we find no abuse of discretion.
XIX. DO THE CUMULATIVE ERRORS IN THIS CASE MANDATE REVERSAL?
¶ 112. In several issues, Bailey claims that the cumulative effect of the errors mandates reversal. As we find only harmless error and no prosecutorial misconduct, we find no accumulation of errors such that would mandate reversal.
¶ 113. THE JUDGMENT OF THE FIRST JUDICIAL DISTRICT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN PRISON IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
LEE AND MYERS, P.JJ, IRVING, CHANDLER, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. KING, C.J. AND CARLTON, J., NOT PARTICIPATING.
NOTES
[1] One witness testified that Cable Man's actual name was Ricky Smith. Another witness identified Cable Man by the name "Eddie." Testimony described Cable Man as a tall, slender, black man with a light complexion. Authorities were not able to locate or apprehend Smith or anyone else known as Cable Man.
[2] Anderson's first name appears as both "Omelin" and "Omelia" in the record. For consistency's sake, we will refer to her as "Omelin Anderson."