# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-KA-00466-COA

DAVID W. PARVIN A/K/A                                    APPELLANT
DAVID WOODROW PARVIN

v.

STATE OF MISSISSIPPI                                       APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/10/2014 |
| TRIAL JUDGE: | HON. PAUL S. FUNDERBURK |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JAMES LAWTON ROBERTSON |
| | JIM WAIDE |
| | RACHEL PIERCE WAIDE |
| | WILLIAM JAMES DUKES |
| | EDWIN POTEAT LUTKEN JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL: |
| | BY: LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | J. TRENT KELLY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF MURDER AND SENTENCED TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED: 02/23/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., ISHEE AND WILSON, JJ.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1.     David Parvin was convicted of the murder of his wife, Joyce Parvin.  On appeal, the

Mississippi Supreme Court found reversible error and ordered a new trial.  *Parvin v. State*

(*Parvin I*), 113 So. 3d 1243 (Miss. 2013).

¶2.     On remand, Parvin was tried a second time in the Circuit Court of Monroe County.

The jury found Parvin guilty of murder.  The trial court sentenced Parvin to serve life in the

custody of the Mississippi Department of Corrections.  Parvin filed post-trial motions, which

were denied.  He then filed a notice of appeal, and the supreme court deflected this appeal

to this Court.  In this appeal, Parvin argues that the evidence was insufficient, the *Weathersby*

rule required his acquittal, his due-process rights were violated, there were errors in the

admission of evidence, the jury was not properly instructed, and cumulative error.  We find

no error and affirm.

FACTS

¶3.     The basic facts were summarized by the supreme court in *Parvin I*:

> On the morning of October 15, 2007, Dr. David Parvin called 911 to report
> that he accidentally had shot Joyce Parvin, his wife of forty-nine years, at their
> home near Aberdeen, Mississippi.  When law enforcement officials arrived,
> Joyce was dead.  She was found in a desk chair, her body draped over the left
> armrest, with a shotgun wound on the right side of her torso.

> Parvin reported to the investigating officers that he had been rushing out of the
> house to shoot a beaver and was carrying a loaded shotgun.  According to
> Parvin, in his haste, he tripped, and during his fall, the gun discharged,
> shooting his wife, who was seated at their home computer.  He told the officers
> that he believed the gun had been parallel to the floor or slightly elevated.  He
> also was unsure about some of the other details: whether he or his wife had
> spotted the beavers first; whether he had tripped over the rug or the dog;
> whether his knee had hit the floor; and whether the barrel of the gun had hit the
> armrest of the chair where Joyce was sitting at the moment it discharged.
> Parvin also said that he typically held the gun, a double-barreled Savage Arms
> Fox 12-gauge shotgun, with his left hand on the fore grip and his right hand
> around the trigger guard, but was unsure whether he had pulled one of the two
> triggers accidentally.  Although Parvin was unsure about many of the details
> surrounding the incident, he maintained at trial that the shooting was an
> accident caused by his unexpectedly tripping and falling while holding the
> shotgun.

2

*Parvin I*, 113 So. 3d at 1244-45 (¶¶2-3). Each of these facts was established at the second trial.

ANALYSIS

I.     *Whether the evidence was insufficient to prove that Parvin acted with "deliberate design" when he accidentally shot and killed his wife.*

¶4.     Parvin was indicted and convicted of the murder of Joyce. Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2006) provides, "The killing of a human being without the authority of law by any means or in any manner [shall be murder] . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being[.]"

¶5.     Parvin admits that he shot and killed Joyce. However, he claims that it was an accident. Parvin argues that there was insufficient evidence to prove that he killed Joyce "with deliberate design to effect the death of the person killed." *Id.* Thus, Parvin contends that the evidence was insufficient as to the element of "deliberate design" or "intent to kill." As a result, Parvin asks this Court to reverse and render his conviction.

¶6.     When the sufficiency of the evidence is challenged, "the critical inquiry is whether the evidence shows beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to meet a conviction." *Sands v. State*, 62 So. 3d 374, 377 (¶14) (Miss. 2011) (internal quotations omitted). The Court "is not required to decide whether it thinks the State proved the defendant's guilt." *Id*. at (¶15). In viewing the evidence in the light most favorable to the prosecution, the relevant question is *whether*

3

*"any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id.* (emphasis added). The supreme court has held:

> If the facts and inferences point in favor of the defendant on any element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the defendant was guilty, then the proper remedy is for the appellate court to reverse and render. But if the evidence shows that reasonable and fair-minded persons, while considering the beyond-a-reasonable-doubt standard in the exercise of impartial deliberations, might have reached different conclusions on every element of the offense, then the evidence will be deemed to have been sufficient.

*Id*. at 377-78 (¶16) (internal quotations and citations omitted).

¶7.     "Deliberate design connotes an intent to kill[.]" *Williams v. State*, 164 So. 3d 1078, 1080 (¶7) (Miss. Ct. App. 2015). "[T]he essence of the required intent is that the accused must have had some appreciable time for reflection and consideration before committing the fatal act." *Craft v. State*, 970 So. 2d 178, 183 (¶17) (Miss. Ct. App. 2007). "Deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent." *Brown v. State*, 965 So. 2d 1023, 1030 (¶28) (Miss. 2007). Furthermore, "deliberate design . . . may be inferred through the intentional use of any instrument which, based on its manner of use, is calculated to produce death or serious bodily injury." *Williams*, 164 So. 3d at 1080 (¶7). In convicting Parvin, the jury determined that Parvin had the deliberate intent to kill Joyce before he shot her with the shotgun.

¶8.     To prove the evidence was sufficient, the State acknowledges that there was no direct evidence of deliberate design. The State, however, points to the testimony of a number of witnesses to prove that the jury had sufficient evidence to find Parvin's intent to kill.

¶9.     The State argues that Parvin's inconsistent accounts of the events surrounding Joyce's

4

death is evidence of deliberate design. First, when Deputy Curtis Knight first spoke with Parvin on the scene, Parvin told him that he tripped over the rug and the gun went off. Second, after Parvin's clothes were taken for testing but while still at the scene, Parvin told Deputy Knight that he was unsure what he tripped over. Third, also while on the scene, Parvin told Sydney Bean, a neighbor and law enforcement officer, that he tripped over the dog and the gun went off. Fourth, when Parvin went in to give a statement, he was unsure what he tripped over, but it may have been the rug or the dog. Fifth, at the first trial four years after Joyce's death, Parvin stated that, just before giving his statement to law enforcement, he was at Amy's house when "it actually came to me exactly that I stepped on the dog." Sixth, while awaiting retrial, Parvin determined that "I tripped, trying not to kill the dog, which I believed I could safely do without the gun firing[;] I somehow -- I moved the safety forward to the off fire position, and somehow I pulled or touched the front trigger, and the gun fired."

¶10. The State claims that Parvin's arguments at the second trial – about the "accident" – contradicted prior versions of how he allegedly fell. In all prior statements and in his trial testimony he stated that the gun "went off"; he did not recall pulling the trigger. He claimed it likely discharged by "striking something real hard," and at one point his thumb was probably on the safety and at another time it was on the side of the frame. Yet on October 16, 2013, six years after the "accident," he remembered that as he fell he moved the safety forward to the off/fire position and pulled or touched the trigger.

¶11. The State presented the expert testimony of Starks Hathcock, a forensic scientist

specializing in firearms identification. Hathcock testified about his findings from tests of Parvin's shotgun. He examined Parvin's shotgun and conducted multiple tests in order to determine whether the gun would fire when jarred or dropped. One of the tests involved hitting various areas of the gun with a cowhide mallet. During this test, the gun did not fire. In another test, the gun did not go off when dropped multiple times at multiple angles. Hathcock dropped the gun twenty-four times at various angles with the safety on and off until the gun broke, and the gun never fired. Further, Hathcock testified that in order to fire, the safety would need to be off and the trigger pulled with a weight of eight to ten pounds. Thus, to a reasonable degree of scientific certainty based upon these tests, Hathcock testified that the gun would not misfire. The State claims that this evidence was inconsistent with Parvin's claim of accidental discharge.

¶12. The State also offered testimony about Parvin's normal actions or habits in the storage and use of guns. Parvin's daughter, Amy, testified about Parvin's life-long insistence on gun safety. Parvin kept his guns in an outside storage room, which was accessible by exiting the house from a door in his bedroom. Parvin's grandson, Clay, testified that Parvin went through his room "most of the time" to go to the channel to shoot on the water. The State argues that this testimony casts doubt on Parvin's claim that in this particular instance, he had a loaded gun in his bedroom, and rather than take the route he always took to the channel, he came through the house, with the intention of walking out the front, down a flight of stairs, and around the house to shoot a beaver.

¶13. Finally, the State points to Parvin's possible motive for wanting to start a new life

without Joyce.  Betty Hamblin testified about her affair with Parvin.  Parvin told her that Joyce talked about killing herself.[1]  However, there was also evidence that Joyce was aware of Parvin's affair with Hamblin, and this was not an issue between them.  The State also offered the fact that Parvin began seeing another woman just three months after Joyce's death.

¶14.    Parvin argues vigorously that the State did not present sufficient proof of "deliberate design" or "intent to kill."  Parvin correctly claims that there was no direct evidence offered by the State as to deliberate design, and the State's evidence on this element of the crime was circumstantial.  Parvin refers us to the distinction between circumstantial and direct evidence:

> This Court previously has defined circumstantial evidence as evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist.  Direct evidence, on the other hand, must directly and not by inference implicate the accused and not just show that there has been a crime.  While evidence does not always fall neatly into one category, examples of direct evidence include an admission or confession by the defendant to a significant element of the offense, or eyewitness testimony to the gravamen of the offense charged.  The term "gravamen" is defined as the  substantial point or essence of a claim, grievance, or complaint.

*Burleson v. State*, 166 So. 3d 499, 509 (¶29) (Miss. 2015) (internal citations and quotation marks omitted).  Further, Parvin argues that Hamblin's testimony, which may be considered the strongest evidence of intent, was inconsistent and unreliable.

¶15.    We must always recognize that "the jury [is] the sole judge of the credibility of witnesses and the weight and worth of their testimony.  [T]he credibility of witnesses is not

---

[1] An extensive discussion about Hamblin's testimony is in the next section and will not be repeated here.  However, the State claims that Hamblin's testimony proves the evidence was sufficient to support the conviction.

7

for the reviewing court." *Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980); *see also*

*Hawthorne v. State*, 835 So. 2d 14, 22 (¶34) (Miss. 2003).  Here, the standard of review for

this issue is not whether this Court finds that the State proved the defendant's guilt.  *Sands*,

62 So. 3d at 377 (¶15).  Instead, we must view the evidence in the light most favorable to the

prosecution and then decide whether "any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt."  *Id.* at (¶14).

¶16.    Based on the evidence discussed above, we find that the evidence was sufficient to

allow a rational fact-finder to find the elements of deliberate design present.  Therefore, we

find no merit to this issue.

> II.     *Whether Parvin is entitled to a judgment of acquittal under the* Weathersby *rule.*

¶17.    Parvin next argues that he should be acquitted under the *Weathersby* rule.  Parvin

begins his argument with this statement:

> *Weathersby* has been called "[t]his often-argued, but seldom-prevailing, rule."
> *Simpson v. State*, 993 So. 2d 400, 407 (¶23) (Miss. Ct. App. 2008).  Still, we
> should never forget the parable of Aesop's Fable of the "Boy Who Cried
> Wolf!"  The Supreme Court in *Parvin I* and the prosecution below have shown
> why this is one of those rare cases where there really is a Wolf afoot!
> *Weathersby* requires acquittal.  As recently as 2008, the Supreme Court
> reaffirmed that reports of the demise of *Weathersby* have been greatly
> exaggerated.  *Au contraire*, it "is alive and well and living in the courtrooms
> of this state."  *Johnson v. State*, 987 So. 2d 420, 424 (¶10) (Miss. 2008)
> (citations omitted).

> A.     *Hamblin's Testimony*

¶18.    Parvin asks that we look closely at the supreme court's decision in *Parvin I*, where the

court ruled:

8

Without the inadmissible expert opinions to establish that Parvin intentionally had shot his wife, he argues that he is entitled to an acquittal under *Weathersby v. State*, 165 Miss. 207, 209, 147 So. 481, 482 (1933). In 1933, the Mississippi Supreme Court declared:

> [W]here the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

*Id.* If the *Weathersby* rule applies "and the defendant's version affords an absolute legal defense, the defendant is entitled to a directed verdict of acquittal." *Green v. State*, 631 So. 2d 167, 174 (Miss. 1994) (citing *Blanks v. State*, 547 So. 2d 29, 33 (Miss. 1989)). There are, however, limitations upon the familiar *Weathersby* rule. For example, it is inapplicable when the defendant's "conduct and statements following the killing are inconsistent with his version of the events as recounted at trial." *Green*, 631 So. 2d at 174 (citing *Blanks*, 547 So. 2d at 33).

We find that Parvin cannot successfully invoke the *Weathersby* rule, given the testimony by his mistress. As recounted above, she testified that Parvin initially told her that Joyce had committed suicide. Sometime later, he admitted that he had lied about the manner of his wife's death and told his paramour that the shooting had been an accident. Because Parvin's claim that his wife had taken her own life contradicted his assertion that he had shot her accidentally, we find that Parvin is not entitled to a judgment of acquittal under *Weathersby*.

. . . .

. . . Additionally, we find that the defendant is not entitled to an acquittal based on the *Weathersby* rule due to his highly inconsistent statements following his wife's death.

*Parvin I*, 113 So. 3d at 1251-52 (¶¶34-36). As a result, it is clear that the supreme court's decision on this issue was based on Betty Hamblin's testimony at trial, which the court described as follows:

Betty Hamblin testified that *Parvin initially had told her Joyce had committed*

9

*suicide, but then he "changed his story" to the version he had given in his initial interview with police.* According to Hamblin, she and Parvin had been engaged in an extramarital affair prior to and after the death of his wife, and she said that, after his wife's death, Parvin had asked her to marry him. She said that she later learned that Parvin had been seeing still another woman, whom he eventually married instead.

*Id*. at 1246 (¶7) (emphasis added).

¶19. For the purpose of this appeal, we carefully examine Betty Hamblin's testimony at the second trial. Parvin argues that the law of *Parvin I* must be followed and faithfully applied in this appeal, and the mandate rule leaves this Court "no discretion in the matter."

¶20. At the first trial, Hamblin testified "that Parvin initially had told her Joyce had committed suicide, but then he 'changed his story' to the version he had given in his initial interview with police." In this appeal, we consider the testimony only at the second trial. Hamblin's testimony about her initial communications with Parvin following his wife's death on October 15, 2007, was as follows:

> Q: Okay, Ms. Hamblin, so that I'm clear[,] . . . the first conversation you had with him, where he talked about his wife being killed, he said she had killed herself?
>
> A: That's what I thought – I thought – I'm sure he said it. I don't know. I just said he had talked about her killing herself before. And I tell you, ma'am – and I still am upset about it. It still bothers me.
>
> . . . .
>
> A: – I don't – you know, at that time he could have – you know, I could have been thinking about her – him talking about her going to kill herself the few times he had said that, way before this ever happened.
>
> Q: Okay, Ms. Hamblin, let's – and I understand that you are upset.
>
> A: I am upset.

10

. . . .

Q:      Ms. Hamblin, do you want to be here today?

A:      No, ma'am.

Q:      You are not comfortable here today; is that right?

A:      No, ma'am.

Q:      You said earlier a few weeks later you met with David Parvin; is that right?

A:      Yeah I – you know, I thought it was a day or two after when he called me, but just saying it was two weeks, or three, it was a good while, but not a long, long time.

Q:      But sometime after that call you did meet with him; is that right?

A:      Yes, ma'am.

Q:      Okay.  And what did he tell you at that time had happened?

A:      Like I said, he was talking about her killing herself, or that's the way I understood that he said that.  Then he turned around and said she tripped on the dog or a rug.  He did.

Q:      And what did he say happened when he tripped on the dog or the rug?

A:      The gun – gun went off, and he had talked about going out and shooting beavers for the last ten years or more.  So, you know, he has done it.

Q:      Ms. Hamblin[] –

A:      I don't know whether he killed them or not, but they had beavers back there building up dams.

¶21.    On cross-examination, Hamblin further testified:

Q:      Well, you were a little unclear about the time of this conversation about suicide. You were –

11

A: There was several years before she ever died, he had mentioned it.

Q: Several years before she ever died?

A: Yeah, different times he would say something like that.

Q: But do you remember very definitely that he told you at some point that he tripped either over a rug or a dog?

A: Yeah, like I told, like I said a while ago, because he had mentioned it years back, I might have misunderstood him. You know what I mean? He might have meant – when he was saying that, I might in my mind, saying he is talking about she committed – she killed herself. I done heard it several times years back.

Q: Several years back?

A: Well, I just told that.

¶22. On redirect, she testified:

Q. Ms. Hamblin, what if anything did Mr. Parvin tell you had happened to his wife after she was killed?

A. Like I said, I have heard him talking about, seven, eight years ago, how many – not a whole bunch, every once in a while he would say, She is talking about killing herself. Well, several weeks, when I did meet him and ride to Tupelo with him and eat, the first thing I thought he said was that she killed herself, and then he said the other, but like I have told you and him, I could have misunderstood that, because I had – I had heard it several times before, about her killing herself.

¶23. Parvin argues that Hamblin's testimony was ambiguous about exactly what Parvin told her after his wife's death. Specifically, he claims that her testimony was repeatedly muddled with statements he made to her "years back" in their relationship. Also, she testified that on numerous occasions during their extramarital affair, Parvin had told Hamblin that his wife had talked about committing suicide. Finally, Parvin points to the fact that Hamblin, at least

12

four times, repeated that she could have confused their communications after Parvin's wife's death with the times she had "heard it several times years back . . . way before this ever happened." Despite her confusion, Hamblin still testified at the second trial to the same facts she testified to at the first trial, namely that Parvin initially told her that Joyce killed herself and later changed his story. For this reason, the *Weathersby* rule is inapplicable.

¶24. It is important to acknowledge that "the jury determines the weight and credibility of witness testimony." *Jones v. State*, 154 So. 3d 872, 881 (¶26) (Miss. 2014). "In those cases in which the defendant is the only eyewitness to the slaying, and in which the *Weathersby* rule is inapplicable . . . , it then becomes a jury issue as to whether to believe or not believe the defendant's testimony of how the slaying occurred[.]" *Blanks*, 547 So. 2d at 33-34. The Court does not determine whether Hamblin's testimony outweighs Parvin's version of events or whether Hamblin was a credible witness. That is the role of the jury.

### B. *Other Inconsistent Accounts of the Killing*

¶25. Aside from Hamblin's testimony, Parvin also gave multiple inconsistent accounts of what occurred on the day he killed Joyce. Throughout the investigation into Joyce's death, Parvin told variable accounts of whether he tripped over a dog, a rug, or his own feet. He also told officers on the day of Joyce's death that the gun "went off." Then at the first trial, Parvin testified that he "did not pull the trigger deliberately, nor [did he] remember pulling the trigger."

¶26. In a more recent letter to his daughter Amy, Parvin recounted in detail what occurred and described how that he tripped while simultaneously moving the safety and pulling the

13

trigger. Parvin argues on appeal that he is "not precisely certain how he pulled the trigger" but that he did in fact pull the trigger. This version of events matches more closely with Hathcock's testimony that the gun did not misfire when dropped.

¶27. Again, "The *Weathersby* rule is . . . inapplicable where the defendant's conduct and statements following the killing are inconsistent with his version of events as recounted at trial." *Green*, 631 So. 2d at 174. Hamblin's testimony, along with the inconsistencies in Parvin's version of events, is sufficient for this Court to decline to apply the *Weathersby* rule; therefore, we find no error as to this issue.

> III.    *Whether Parvin was denied due process*.

¶28. Parvin argues that for this Court to affirm his conviction would result in a violation of due process. Essentially, he reasserts his claim that there was insufficient evidence to prove deliberate design. As an alternative, Parvin challenges the credibility of the evidence presented. The Court has found sufficient evidence as well as specific evidence that precludes the application of the *Weathersby* rule. Therefore, we also find that this issue has no merit, and there is no need to address it further.

> IV.    *Whether the trial court erred in denying Parvin's request to introduce telephone records into evidence.*

¶29. During trial, Parvin attempted to discredit Hamblin's testimony about their telephone conversations by introducing Parvin's telephone records. Parvin's counsel sought to have the records admitted into evidence as ordinarily kept business records.

¶30. The admission or exclusion of evidence is within the sound discretion of the trial judge and will not be reversed absent an abuse of discretion. *Ferguson v. Snell*, 905 So. 2d

14

516, 518 (¶8) (Miss. 2004); *Bailey v. State*, 956 So. 2d 1016, 1025 (¶¶25-26) (Miss. Ct. App. 2007). "Abuse of discretion will only be found where a defendant shows clear prejudice resulting from an undue lack of constraint on the prosecution or undue constraint on the defense." *Bailey*, 956 So. 2d at 1025 (¶25). "Any error in the admission or exclusion of evidence is not grounds for reversal unless the error adversely affected a substantial right of a party." *Id.* at 1025-26 (¶26).

¶31. The first witness called by the State was Curtis Knight, chief deputy of the Monroe County Sheriff's Department. On cross-examination, Parvin's counsel sought to introduce Parvin's telephone records that were subpoenaed by the sheriff's department. The prosecutor objected on the grounds of hearsay and Deputy Knight's inability to authenticate the records. Parvin argued that Deputy Knight's testimony was sufficient for authentication purposes because Deputy Knight received the records pursuant to a subpoena he requested. The trial court sustained the objection.

¶32. Clearly, the telephone records are hearsay. The records are a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.E. 801(c). As such, the records are not admissible. M.R.E. 802. The records could be admitted under Mississippi Rule of Evidence 803(6) as "Records of Regularly Conducted Activity" but would need a sponsoring witness, "a person with knowledge . . . as shown by the testimony of the custodian or other qualified witness or [the records must be] self-authenticated pursuant to Mississippi Rule of Evidence 902(11) . . . ." For the telephone records to be self-authenticating, Parvin would have had to follow

15

Rule 902(11):

Certified Records of Regularly Conducted Activities.

(A) The records of a regularly conducted activity, within the scope of Rule 803(6), about which a certificate of the custodian or other qualified witness shows (i) the first hand knowledge of that person about the making, maintenance and storage of the records; (ii) evidence that the records are authentic as required by Rule 901(a) and comply with Article X; and (iii) that the records were (a) made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; (b) kept in the course of the regularly conducted activity; and (c) made by the regularly conducted activity as a regular practice. Such records are not self-authenticating if the sources of information or the method or circumstances of preparation indicate lack of trustworthiness.

(B) As used in this subsection, "certificate" means, (i) with respect to a domestic record, a written declaration under oath or attestation subject to the penalty of perjury; . . . .

(C)(i) Records so certified will be self-authenticating only if the proponent gives notice to adverse parties of the intent to offer the records as self-authenticating under this rule and provides a copy of the records and of the authenticating certificate. Such notice must be given sufficiently in advance of the trial or hearing at which they will be offered to provide the adverse party a fair opportunity to consider the offer and state any objections. (ii) Objections will be waived unless, within fifteen days after receiving the notice, the objector serves written specific objections or obtains agreement of the proponent or moves the court to enlarge the time. (iii) The proponent will be responsible for scheduling a hearing on any objections and the court should hear and decide such objections before the trial or hearing at which they will be offered. If the court cannot rule on the objections before the trial or hearing, the records will not be self-authenticating. (iv) If in a civil case, on motion by the proponent after the trial or hearing, the court determines that the objections raised no genuine questions and were made without arguable good cause, the expenses incurred by the proponent in presenting the evidence necessary to secure admission of the records shall be assessed against the objecting party and attorney.

¶33. This Court has held that "[b]usiness records, such as telephone billing information, are typically admitted under what is known as the business-records exception[.]" *Bartolo v.*

16

*State*, 32 So. 3d 522, 531 (¶34) (Miss. 2009). This exception provides for admission of records "made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the . . . record." *Id.*

¶34. We find that the trial court did not abuse its discretion when it sustained the objection and excluded the telephone records from evidence when offered through Deputy Knight. "A trial judge has wide discretion in ruling on the admissibility of testimony offered at trial[.]" *Bailey*, 956 So. 2d at 1026 (¶31). We find this issue is without merit.

     *V.*     *Whether the trial court erred in admitting Parvin's prior testimony.*

¶35. Parvin next argues that the trial court erred when it allowed the State to introduce Parvin's testimony from the first trial. Parvin claims that the only reason he testified in the first trial was to rebut the improper evidence. He also maintains that his testimony was not an "admission" within the confines of the Mississippi Rules of Evidence.

¶36. "The relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused." *Fulks v. State*, 110 So. 3d 764, 769 (¶19) (Miss. 2013) (quoting *Johnston v. State*, 567 So. 2d 237, 238 (Miss. 1990)). "Former testimony, voluntarily given in a criminal trial, may be introduced in a subsequent trial upon remand or where the first trial ended in a mistrial." *Id.* at 770 (¶21) (quoting *Reed v. State*, 523 So. 2d 62, 67 (Miss. 1988)). The supreme court has "held that a defendant's testimony at a former trial that constitutes an admission under the laws of evidence may be presented in a later trial of the defendant." *Id.* at (¶22) (citing

17

*Stringer v. State*, 491 So. 2d 837, 841 (Miss. 1986)).

¶37.    Parvin argues that his testimony at the first trial was induced by the improper evidence admitted during that trial.[2]  He relies on *Harrison v. State*, 392 U.S. 219 (1968), for the proposition that his testimony should be inadmissible in later proceedings because he testified "in order to overcome the impact" of evidence improperly admitted.  *Id.* at 223.  However, in *Harrison*, the defendant "testified only after the Government had illegally introduced into evidence three confessions, all wrongfully obtained."  *Id.* at 222.  Numerous jurisdictions have held that *Harrison* "is limited to situations in which a defendant's testimony during a first trial is induced by constitutionally inadmissible evidence[.]"  *State v. Hunt*, 457 S.E.2d 276, 285 (N.C. 1994).  So "even if [the] defendant's testimony at his first trial was induced by evidence which was inadmissible under the rules of evidence, and not because it was unconstitutionally obtained, the *Harrison* exception to the general rule permitting the testimony to be offered at the second trial would not apply."  *Id.* (citing *United States v. Mortensen*, 860 F.2d 948, 951 (9th Cir. 1988); *State v. Castonguay*, 590 A.2d 901, 904 (Conn. 1991);  *People v. Armentero*, 384 N.W.2d 98 (Mich. Ct. App. 1986); *State v. Wills*, 240 S.E.2d 328, 330-31 (N.C. 1977)).

¶38.    Furthermore, it does not appear from the record that Parvin's testimony at the first trial

---

[2] In *Parvin I*, the supreme court held that the expert opinion of pathologist Dr. Steven Hayne regarding the distance and trajectory measurements of the shotgun wound and the computer-generated recreation of the shooting based upon these measurements were improperly admitted in trial.  *Parvin I*, 113 So. 3d at 1248-51 (¶¶22-33).  "[T]he speculative 'expert' opinions and the accompanying computer-generated depictions of the 'possible' account of the shooting should not have been placed before the jury.  As this constituted the main evidence utilized to undermine Parvin's defense, reversal is required."  *Id.* at (¶33) (internal citation omitted).

was provoked by improper expert testimony, as it appears that it was his strong desire to testify. The record from the second trial evinces that Parvin may have willingly taken the stand again if given more of an opportunity, though against his attorneys' advice. Parvin's attorneys requested that the trial court not voir dire Parvin regarding his right to testify out of concern that Parvin would take the stand, and the court obliged counsel by asking Parvin only one question.

¶39.    Finally, Parvin's testimony does constitute "an admission, as that concept is understood in our law of evidence." *Fulks*, 110 So. 3d at 770 (¶22). Parvin's statement was admissible as an exception to the hearsay rule, under Mississippi Rule of Evidence 801(d)(2), because the statement offered against him was Parvin's "own statement, in either an individual or a representative capacity." *Fulks*, 110 So. 3d at 770 (¶20); M.R.E. 801(d)(2). Accordingly, we find that the trial court did not abuse its discretion. We find no merit to this issue.

> *VI.    Whether the trial court erroneously instructed the jury*.

¶40.    Parvin next argues that the trial court erred in rejecting two jury instructions, one addressing his prior conviction and one addressing circumstantial evidence. In *Hull v. State*, 174 So. 3d 887, 899 (¶34) (Miss. Ct. App. 2015), this Court ruled:

> The standard of review for the refusal of jury instructions is abuse of discretion.
>
> . . . .
>
> The instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. There is no error if all instructions taken as a

19

whole fairly, but not necessarily perfectly, announce the applicable rules of law.

. . . .

Further, a defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence. If the instructions fairly announce the law of the case and create no injustice, no reversible error will be found.

(Internal citations and quotation marks omitted).

### A. Jury Instruction as to Prior Conviction

¶41. Parvin requested that the trial judge instruct the jury that it must disregard the fact that Parvin had been convicted in a prior trial. The trial court denied this request. Parvin appeals this ruling.

¶42. Parvin particularly complains that his daughter, Amy Henley, made a statement during her testimony about Parvin's previous trial and conviction. Though Henley was the first to mention the prior trial, she was certainly not the last. Parvin's counsel asked many of the witnesses about their testimony in the past trial. Further, Parvin did not object at the first mention of the prior conviction during Henley's testimony. The trial court, in rejecting the offered jury instruction, found that was the appropriate time for such an objection.

¶43. Parvin has not offered and we have found no authority that would indicate the trial court abused its discretion in this decision. Accordingly, we find no abuse of discretion. This issue is without merit.

### B. Jury Instruction as to Circumstantial Evidence

¶44.   Parvin also requested circumstantial-evidence instructions, which were rejected by the trial court.  Particularly, Parvin requested that the jury be instructed that it could not return a verdict of guilty unless it found the element of "deliberate design" beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence.

¶45.   "When the evidence against the accused is wholly circumstantial in nature, the trial court must instruct the jury that the State is required to prove the accused's guilt not only beyond a reasonable doubt, but to the exclusion of every reasonable hypothesis other than that of guilt." *McCoy v. State*, 147 So. 3d 333, 351 (¶47) (Miss. 2014) (internal quotation marks omitted).  "Circumstantial evidence cases lack direct evidence . . . . But where the accused has made an admission on an element of the offense, the case is no longer circumstantial such that a circumstantial[-]evidence instruction is required." *Bennett v. State*, 933 So. 2d 930, 948 (¶66) (Miss. 2006).

¶46.   When both circumstantial and direct evidence are admitted at trial, the defendant is not entitled to a circumstantial-evidence instruction.  *Id.*  "[D]irect evidence has been held to include evidence such as eyewitness testimony, the defendant's confession to the offense charged, or the defendant's admission as to an important element thereof."  *Id.* at (¶67); *Turner v. State*, 910 So. 2d 598, 603 (¶17) (Miss. Ct. App. 2005).

¶47.   Recently, in *Holliman v. State*, 178 So. 3d 689 (Miss. 2015), the supreme court considered this very issue.  The court held:

> Holliman requested a circumstantial-evidence instruction, which stated that "[i]n order for you to find Brian D. Holliman[] guilty of Murder, you must first find him guilty not only beyond a reasonable doubt, but also to the exclusion of every reasonable hypothesis consistent with innocence."  The trial court

21

denied the instruction because a circumstantial-evidence instruction is not warranted when the defendant has admitted a significant element of the charged offense. This is because an admission to a significant element of the charged offense constitutes direct evidence, and a circumstantial-evidence instruction should be granted only if the evidence is purely circumstantial. Holliman's admission that he shot Laura was an admission to the "killing of a human being" element of the charged crime of first-degree murder. Holliman admits that his admission to shooting Laura constituted direct evidence. But he argues that this Court should require a circumstantial-evidence instruction if intent is the only disputed element and the State's evidence on that element is circumstantial.

We decline to adopt Holliman's argument. Even when other evidence in a case is direct, the element of intent is usually proven by circumstantial evidence because, unless a defendant expressly states his intent at the time of the crime, intent can be proven only by the act itself and the surrounding circumstances. To require a circumstantial-evidence instruction every time intent is disputed would require a circumstantial-evidence instruction in virtually every case. But "[o]ur precedent consistently adheres to the rule that any direct evidence presented at trial is sufficient to preclude a circumstantial[-]evidence instruction." "[I]t [is not] unusual for criminal cases to contain some direct evidence and some circumstantial evidence." We reject Holliman's proposed rule because it would eliminate any distinction between a circumstantial-evidence case and a direct-evidence case.

*Id.* at 702 (¶¶33-34).

¶48. As in *Holliman*, the evidence presented at Parvin's trial was not entirely circumstantial. Parvin, like Holliman, admitted that he shot his wife. Parvin argues that the evidence presented for the "deliberate design" element was circumstantial and that he is therefore entitled to a circumstantial-evidence instruction. *Holliman* rejected that argument. Because Parvin admitted to an element of the crime – that he killed Joyce – Parvin's admission constituted direct evidence. *Id.* We find this issue to be without merit.

> VII. *Whether Parvin is entitled to a new trial and whether an accumulation of errors denied Parvin due process of law*.

22

¶49. Finally, Parvin requests a new trial and asserts that cumulative error has violated his right to due process. Because we have found no error, we also find that a new trial is not warranted.

¶50. **THE JUDGMENT OF THE MONROE COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING, P.J., BARNES, ISHEE, CARLTON, FAIR AND JAMES, JJ., CONCUR. WILSON, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. GREENLEE, J., NOT PARTICIPATING.**