# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-00735-COA

**JOHNNY SLAUGHTER A/K/A JOHNNY SLAUGHTER JR. A/K/A BULLET**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                    **APPELLEE**

DATE OF JUDGMENT: 03/29/2019
TRIAL JUDGE: HON. LEE J. HOWARD
COURT FROM WHICH APPEALED: NOXUBEE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT: RODNEY A. RAY
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
 BY: ALLISON ELIZABETH HORNE
DISTRICT ATTORNEY: SCOTT WINSTON COLOM
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 10/20/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1. Johnny "Bullet" Slaughter stabbed and killed Dennis Gavin in a fight outside a club in Macon. Slaughter was indicted for first-degree murder, and following a jury trial, he was convicted of the lesser-included offense of manslaughter. On appeal, Slaughter argues that there is insufficient evidence to support his conviction and that the jury's verdict is against the overwhelming weight of the evidence. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On November 2, 2015, Macon police officer Doug Triplett responded to a call about a fight at Talk of the Town, a club in Macon. When Triplett arrived, he saw Gavin lying in

the street, apparently dead. Witnesses told Triplett that Slaughter killed Gavin. Slaughter was standing nearby next to his truck. When Triplett approached Slaughter, Slaughter handed him a knife. Slaughter stated that the knife belonged to Gavin, that Gavin had pulled the knife during their fight, and that he took it from Gavin. Slaughter's eye was swollen shut from an apparent injury.

¶3.     The county coroner found a second knife underneath Gavin's body. The knife was near the middle of Gavin's back close to his waist. The coroner immediately turned the knife over to law enforcement.

¶4.     Dr. Mark LeVaughn, the State's chief medical examiner, testified that the toxicology report from Gavin's autopsy showed that he had a blood alcohol content of .274. Gavin had at least fourteen distinct stab wounds, including a lethal stab to his carotid artery that caused him to bleed to death in a "very short period of time."

¶5.     Willie Jones testified that he was driving home on November 2, 2015, when he saw Slaughter standing in a parking lot across the street from Talk of the Town. Slaughter waved Jones down and told Jones that he had "been into it" with Gavin earlier that evening at Arthur Shanklin's house. Slaughter stated that Gavin had pulled a knife on him and that he left Shanklin's house to avoid trouble. However, Slaughter also said that if Gavin bothered him again, he was "going to do something" to Gavin. Slaughter stated that Gavin "had" him when they were at Shanklin's house, but now he had "something" for Gavin. Jones encouraged Slaughter to go home and leave Gavin alone. When Jones left, he and Slaughter hugged. Jones testified that Slaughter put Jones's hand on Slaughter's side, and Jones felt

"something hard" concealed near Slaughter's waist.  Jones did not know if the object was a knife or just a cell phone, but this occurred just before or just after Slaughter said that he had "something" for Gavin or was "going to do something" to Gavin.

¶6.     Cornell Patterson testified that he saw Slaughter sitting in his truck near Talk of the Town around 6:30 or 7 p.m.  Slaughter also told Patterson about his confrontation with Gavin at Shanklin's house earlier that evening.  As they talked, Gavin walked out of the club and approached Slaughter.  Gavin asked Slaughter if they were "okay" and "all right," and Slaughter said they were.  But when Gavin asked Slaughter to shake his hand, Slaughter said, "I ain't going to shake your hand" and "we ain't all right" and walked away.

¶7.     Patterson went inside the club, but he looked out occasionally to check on Slaughter and Gavin.  Later, someone in the club yelled that there was a fight outside.  Patterson saw someone in a white shirt and someone taking swings but could not make out any details.  Patterson stayed in the club until the fight seemed to calm down and then left.

¶8.     Joann Harris and Tiffany King were together at Talk of the Town that night.  Harris lived with Gavin at the time.  Patterson approached her in the club and told her to go get Gavin from the parking lot because he and Slaughter were "into it."  Harris looked outside and saw the men talking, so she returned to her friends.  Patterson came back a few minutes later and again told her to get Gavin.  Harris checked outside again and saw nothing out of the ordinary.  About two minutes later, Patterson told her Gavin and Slaughter were fighting.  Harris ran outside and told someone to call the police.

¶9.     King also testified that Patterson approached her and Harris three times that night,

asking Harris to get Gavin. King said that the second time, Patterson told them that "Slaughter said he was going to kill [Gavin]." King looked outside prior to the fight and saw the two men talking, not arguing. When she heard there was a fight, she looked outside. She saw Slaughter holding Gavin by the shirt and Gavin swinging at Slaughter. She did not see anything in either man's hand. She saw Gavin fall and the fight stop. King and Harris both testified that Slaughter stood nearby talking on his cell phone after he killed Gavin.

¶10. King had also been at Shanklin's house earlier that evening. She testified that a group of people were drinking and talking at Shanklin's house. Gavin was already there when King arrived. When Slaughter and Earnest Calhoun left to go to the liquor store, Gavin gave Slaughter money to buy beer. However, Slaughter returned without the beer and gave Gavin his money back. Later, Gavin asked Slaughter for some of his whiskey. Slaughter told Gavin there was no more whiskey, and the men started arguing. As King was leaving Shanklin's house, she heard someone say that Gavin pulled a knife on Slaughter.

¶11. A short time later, King ran into Gavin near Talk of the Town. By that time, Gavin had gotten more whiskey, but he dropped his bottle and it shattered. King told Gavin to go home because he was too drunk. Gavin told King he was "going home within an hour" but wanted "to try to apologize" to Slaughter first.

¶12. Slaughter called Eddie Little as a witness at trial. Little testified that as he was driving home from work, he saw Gavin, Slaughter, and Calhoun standing and talking near Slaughter's truck, which was parked across the street from Talk of the Town. Little parked and joined them. The men were discussing the earlier confrontation at Shanklin's. Calhoun

4

wanted Slaughter and Gavin to discuss the fight, but Gavin said it was over. Gavin and Slaughter then fist-bumped and "squashed" the fight. However, according to Little, Gavin also told Calhoun that he "was going to get" Slaughter at Shanklin's house until Calhoun got in the way. Calhoun left, and Gavin walked back toward the club. Little and Slaughter continued talking.

¶13. Little testified that about twenty minutes later, Gavin yelled across the street, "Bullet, Bullet, where's Calhoun?" Little believed that Gavin was taunting Slaughter—because Gavin had said earlier that Calhoun was the only reason he had not attacked Slaughter at Shanklin's house. According to Little, Gavin later returned and said that he and Slaughter were going to fight, but Slaughter said that they had "squashed" their argument and had "no issue." According to Little, Slaughter said he was going home and walked toward the driver's side door of his truck. Little testified that Gavin walked toward Slaughter and that he (Little) grabbed Gavin and tried to hold him back. According to Little, Gavin said, "get your hands off of me," so Little "turn[ed] [Gavin] loose." Little testified that Gavin and Slaughter then "stood face-to-face" and then began fighting. Little stopped trying to intervene at that point. Little witnessed the fight but testified that he never saw either man holding a knife.

¶14. Slaughter also testified at trial.[1] He stated that he stopped at Shanklin's house on his

---

[1] Before Slaughter testified, the State argued that he had "opened the door" to evidence of his prior conviction for manslaughter by questioning Little about Gavin's "reputation in the community for peace and violence." In response, Slaughter's attorney stated that Slaughter would admit to the conviction on direct examination and therefore waived a *Peterson* hearing on the issue. *See Peterson v. State*, 518 So. 2d 632, 635-38 (Miss. 1987) (discussing the procedures that a court must follow and factors that a court must

way home from work. Slaughter decided to make a run to the liquor store and took orders from some of the people at Shanklin's house. Gavin asked for a specific kind of beer and gave Slaughter money for it. However, the store did not have the beer that Gavin wanted, so Slaughter returned Gavin's money. Slaughter stated that he did not buy some other kind of beer because he knew Gavin would complain.

¶15. When Slaughter returned to Shanklin's house, he stayed and talked to some of the others there. Gavin continued complaining that he had not gotten any beer, and he asked Slaughter for some whiskey. According to Slaughter, he and Gavin argued briefly about whether Gavin could drink straight from the bottle, and eventually he poured some whiskey into a cup for Gavin. Slaughter testified that Gavin finished his cup and asked for more, but Slaughter declined. Slaughter testified that Gavin began cursing and shoved Slaughter, which caused Slaughter to drop his beer. Gavin continued moving toward Slaughter, but Calhoun intervened, and Slaughter got in his truck and left.

¶16. As Slaughter drove past Talk of the Town, he decided to park and talk with some of the men he saw. A short time later, Calhoun and Gavin approached him, but Slaughter told Gavin that he was "through with" their argument and did not need to talk to him. Calhoun wanted Gavin and Slaughter to shake hands, but Slaughter declined. Nonetheless, the men agreed they were "cool" and fist-bumped. Gavin went inside Talk of the Town, while Slaughter remained outside talking to others.

---

consider before evidence of a defendant's prior conviction may be admitted under Mississippi Rule of Evidence 609). Slaughter acknowledged the conviction during his testimony on direct examination.

¶17.    Like Little, Slaughter also testified that Gavin later came back outside, taunted him, and tried to fight with him.  He also testified that Little unsuccessfully attempted to stop the fight.  Slaughter claimed that while he and Gavin were arguing, he saw "something shiny" in Gavin's hand but could not tell whether the object was a "knife," a "pipe," or a "baseball bat."  Slaughter testified that he was standing near the tailgate of his truck when Gavin advanced toward him.  Slaughter testified that he went to the passenger side of his truck, reached inside the truck, and took out a knife.  According to Slaughter, he "stood there" with the knife and told Gavin to "go on."  Slaughter also told Gavin that he would not "run[] from" him and was "tired" of dealing with him.

¶18.    Slaughter testified that he told Gavin he was "fixing to go," he put his knife back in his pocket, and he started to get into his truck to leave.  At that point, according to Slaughter, Gavin suddenly punched him and began "pulling" on him.  In response, Slaughter drew his knife and stabbed Gavin repeatedly.  Slaughter testified, "I just went to swinging, and swinging, and swinging.  I did not try to kill [Gavin].  If he got killed, he got killed [by] accident . . . . I did not try to kill [Gavin].  I tried my best to go around [Gavin]."

¶19.    Slaughter testified that he did not know whether Gavin struck him with his fist or some object.  He testified that he saw something "gray" or "shiny" in Gavin's hand before Gavin hit him, but he could not identify the object.  Slaughter said that he had been in fights before, but he had never been hit like Gavin hit him that night.  He claimed that "everything went dark" and he "couldn't see at all" after Gavin hit him.  Slaughter testified that he continued "swinging" at Gavin because he was afraid that Gavin was trying to kill him.  He

7

claimed that he could not remember whether he was "swinging" with his knife or just his fists. He claimed that he did not want to injure or kill Gavin but only "wanted [Gavin] to get off [him]." Slaughter testified that Gavin eventually "just dropped" to the ground and the fight was over. He claimed that he still could not see Gavin, although he could hear other people saying "Bullet got a knife" and "don't cut him."

¶20. Slaughter denied that he used his cell phone after he killed Gavin. Slaughter waited for the police to arrive and gave Triplett his knife. At trial, Slaughter denied that he told Triplett that the knife was Gavin's or that he had taken it away from Gavin during the fight. Slaughter stated that Triplett was lying in his testimony at trial. Slaughter acknowledged that he was able to use his phone as he was being arrested. According to Slaughter, he still could not see clearly but was able to call his wife using speed dial. Slaughter was taken to the local hospital and later transferred to Jackson. Slaughter testified that he suffered a broken eye socket and fractured nose. He did not require surgery but claimed that he still suffered from some vision problems.

¶21. The court instructed the jury on first-degree murder, necessary self-defense, and imperfect self-defense (manslaughter). The jury found Slaughter guilty of manslaughter. The court sentenced Slaughter to serve a term of twenty years in the custody of the Department of Corrections with ten years suspended and ten years to serve. Slaughter filed a motion for judgment notwithstanding the verdict (JNOV) or a new trial, which was denied, and a notice of appeal. On appeal, Slaughter argues that there is insufficient evidence to support his conviction and, in the alternative, that the jury's verdict is against the

8

overwhelming weight of the evidence.

## ANALYSIS

¶22. A motion for JNOV "challenges the sufficiency of the evidence." *Little v. State*, 233 So. 3d 288, 291 (¶16) (Miss. 2017). We review the denial of a motion for JNOV de novo. *Haynes v. State*, 250 So. 3d 1241, 1244 (¶6) (Miss. 2018). However, we must accept all credible evidence of guilt as true and grant the State all reasonable inferences that may be drawn from the evidence. *Id.* We will reverse the conviction only if no reasonable juror could have found the defendant guilty beyond a reasonable doubt. *Id.* We must affirm if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Shelton v. State*, 214 So. 3d 250, 256 (¶29) (Miss. 2017)).

¶23. A motion for a new trial "challenges the weight of the evidence." *Little*, 233 So. 3d at 291 (¶16). We review the trial judge's denial of a motion for a new trial only for an abuse of discretion. *Id.* at 292 (¶21). We "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* at 289 (¶1). On appeal, we do not "assume[] the role of juror on appeal. We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.*

¶24. The jury in this case found Slaughter guilty of imperfect self-defense manslaughter. "Unlike true self-defense, imperfect self-defense is not a defense to a criminal act." *Ronk v. State*, 172 So. 3d 1112, 1126 (¶22) (Miss. 2015). "Rather, under the theory of imperfect

9

self-defense, an intentional killing may be considered manslaughter if done without malice but under a bona fide (but unfounded) belief that it was necessary to prevent death or great bodily harm." *Id.* (quotation marks omitted). In other words, a defendant is guilty of imperfect self-defense manslaughter if he kills the victim based on a subjective, but objectively unreasonable, belief that the killing is necessary to prevent death or great bodily harm. *Nelson v. State*, 284 So. 3d 711, 716 (¶19) (Miss. 2019).

¶25. On appeal, Slaughter argues that he killed Gavin in necessary self-defense, Miss. Code Ann. § 97-3-15(1)(f) (Rev. 2014), and that he is entitled to a judgment of acquittal based on the "*Weathersby* rule." The "*Weathersby* rule" holds that "where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge." *Weathersby v. State*, 165 Miss. 207, 209, 147 So. 481, 482 (1933). "There are, however, limitations upon the familiar *Weathersby* rule. For example, it is inapplicable when the defendant's 'conduct and statements following the killing are inconsistent with his version of the events as recounted at trial.'" *Parvin v. State*, 212 So. 3d 863, 871 (¶18) (Miss. Ct. App. 2016) (quoting *Green v. State*, 631 So. 2d 167, 174 (Miss. 1994)). In addition, "if the defendant's testimony satisfies all the elements of murder or manslaughter, the defendant would not be entitled to a directed verdict of acquittal, as this testimony would be the basis for a valid conviction, and the *Weathersby* rule would not apply." *Booker v. State*, 64 So. 3d 965, 970 (¶17) (Miss. 2011) (quotation marks, brackets omitted).

¶26.     We conclude that the *Weathersby* rule is inapplicable on the facts of this case.  For one reason, Slaughter's statements to Triplett following the killing were materially inconsistent with his version of events at trial.  According to Triplett, Slaughter initially claimed that Gavin pulled a knife on Slaughter and that Slaughter then took the knife from Gavin and used it to kill Gavin.  At trial, however, Slaughter acknowledged that the knife was his own and that he never actually saw Gavin holding a knife—only some unidentified object that was "gray" or "shiny."  The jury was free to believe either Triplett or Slaughter, but Triplett's testimony renders the *Weathersby* rule "inapplicable."  *Parvin*, 212 So. 3d at 873 (¶¶23-24).

¶27.     The *Weathersby* rule is also inapplicable because Slaughter's own testimony could support the jury's verdict.  Slaughter admitted that Gavin never actually threatened him with a knife, and he could not say that he ever saw Gavin holding a knife.  Nor did Little or any other witness see Gavin holding a knife.  Furthermore, the physical evidence permits a reasonable inference that Gavin never drew the knife that was found under his body near the middle of his back.  According to Slaughter's own testimony, he stabbed Gavin fourteen times in response to one punch—even as he could hear onlookers begging him to stop.  Based on Slaughter's own testimony, the jury could have determined that his use of deadly force was not reasonable or necessary self-defense.

¶28.     *Weathersby* rule aside, the evidence as a whole is sufficient to sustain Slaughter's conviction.  There is substantial evidence to contradict Slaughter's claim that he was trying to avoid a fight with Gavin.  Jones testified that Slaughter said that he had "something" for

11

Gavin or was "going to do something" to Gavin prior to the fight. Jones's testimony also permits a reasonable inference that Slaughter was already armed with a knife and ready for a fight before his fatal encounter with Gavin. In addition, there was testimony that Slaughter threatened to kill Gavin just before the fight started. A rational jury could have found that Slaughter stabbed Gavin fourteen times despite the fact that Gavin never drew a weapon. In short, considering the evidence in the light most favorable to the State, a rational jury could have rejected Slaughter's claim of necessary self-defense and found him guilty of manslaughter. Accordingly, the trial court did not err by denying Slaughter's motion for JNOV. *Haynes*, 250 So. 3d at 1244 (¶6).

¶29. In addition, we cannot say that the jury's verdict is against the overwhelming weight of the evidence. The State presented substantial evidence that undermined Slaughter's claim of necessary self-defense, and as discussed above, Slaughter's own testimony supports the jury's verdict in certain respects. Viewing the evidence in the light most favorable to the jury's verdict, we cannot say that "it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little*, 233 So. 3d at 289 (¶1). Therefore, the trial court did not abuse its discretion by denying Slaughter's motion for a new trial, and we affirm Slaughter's conviction and sentence.

¶30. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR.**